**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard Marion DOTA, aka Dickie
Stevens, Defendant–Appellant.**

No. 93–50011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1994.

Decided Aug. 31, 1994.

H. Dean Steward, Directing Atty., Federal Public Defender's Office, Santa Ana, CA, for defendant-appellant.

Wayne R. Gross, Asst. U.S. Atty., Santa Ana, CA, for plaintiff-appellee.

Before: WIGGINS, NELSON, Circuit Judges, and REED,* District Judge.

* Hon. Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

WIGGINS, Circuit Judge:

Richard Dota appeals his conviction and sentence for conspiracy, murder for hire, and use of a firearm during a crime of violence. We affirm.

## FACTS

Though disputed in some instances, testimony showing the following facts was presented at Dota's jury trial.

Julius Schill was president of APS, a company that made and sold self-operated photo booths and business card machines. Cynthia Asher was Schill's secretary. Schill tried to give Asher gifts in exchange for her companionship and sexual favors. Though she accepted some items from Schill, she claims to have rejected his overtures in July, 1991. At the time, Asher had a boyfriend named Wilbur Constable.

In August, 1991, Schill met with Richard Dota. Defense witnesses said Schill meant to hire Dota as a salesman. Dota had some contact with mall and casino owners/operators and had placed APS machines before. At the August meeting, Schill signed a contract hiring Dota. After the meeting, Schill instructed an APS employee to prepare a $21,000 check for Dota.

The government argued at trial that the August meeting was a sham and that the $21,000 was payment to Dota in exchange for Dota arranging Constable's murder. Shortly after the meeting, Dota met with Blake Yoon. Yoon and Dota had worked together in the past to collect gambling debts by intimidation. On this occasion, Dota gave Yoon three thousand dollars and instructed him to murder Constable.

In September, 1991, Yoon watched Constable's residence. Late that month, Yoon was arrested near the residence by the local sheriff for providing false identification. Yoon was kept overnight in jail. When released the next morning, Yoon called Dota. Dota reassured Yoon. On October 3, 1991, Dota flew to California to meet with Yoon. They decided it would no longer be safe to murder Constable at home. So they devised a plan to lure Constable from his work. Dota flew back to Las Vegas.

On October 11, 1991, Yoon, assisted by John Caravaggio and Scott Smith, carried out the plan. That night, at about 11:00 p.m., Constable finished his work at Home Depot and walked to the parking lot. He discovered a dent in the car he had driven to work. He also found business cards on the car. The cards indicated that a Dr. Chris Fernando had accidentally hit the car and wanted to talk to Constable. Constable called the number on one card and arranged to meet later that night the person who answered.

When Constable arrived at the alleged doctor's office, three men met him in the parking lot. These three beat Constable with baseball bats. In the course of the beating, Constable's gun (which one of the three had taken from Constable) accidentally fired. The three men then decided to leave. Before leaving, however, Yoon, using Yoon's own gun, shot Constable in the head. Constable was found a short time later. He survived.

On October 13, 1991, Asher called Schill and told him that she would not be at work that day because Constable was hurt. Schill called Dota. Dota then called Yoon and told him that Constable was still alive. Yoon became concerned and met with a private investigator. Yoon asked the investigator to determine whether Constable would survive. The investigator and the FBI videotaped the meeting with Yoon. Another man at the meeting, introduced to Yoon as a private investigator, was in fact an FBI agent. When Yoon later became aware of these facts, he confessed and agreed to cooperate. Caravaggio and Smith were later arrested with Yoon's help.

Yoon told agents that Dota had hired him to kill Constable. Yoon then called Dota repeatedly by phone. Dota, unaware of Yoon's arrest, made numerous incriminating statements. Dota instructed Yoon to tell authorities that Yoon knew nothing. To bolster this advice, Dota said that he had once been arrested in Palm Springs for a minor

offense, had told the authorities he knew nothing, and as a result had not been charged. On another occasion, Dota discussed with Yoon a plan to blame the Constable assault on Edward Pucci, a recently deceased bookmaker. Dota also told Yoon to send a messenger to the jail to tell Caravaggio and Smith to keep their "mouth [sic] shut." On January 6, 1992, federal agents arrested Dota in Las Vegas.

On January 16, 1992, a federal indictment was returned charging Schill, Dota, Yoon, Caravaggio, and Smith with conspiracy, murder for hire, and use of a firearm in connection with a crime of violence. Because Dota was arrested in Las Vegas, Dota did not make his first appearance in federal court in California until January 27, 1992, when he was arraigned. Yoon, Caravaggio, and Smith first appeared in federal court on February 10, 1992. Yoon, Caravaggio, and Smith had been charged with violations of state law and had to be transferred from state to federal custody.

Trial was initially set for March 2, 1992. On February 19, Schill filed a motion to continue the trial. The government and Schill's codefendants, except Dota, agreed that a continuance was necessary. On February 25, 1992, the court signed an order finding excludable time under the Speedy Trial Act ("Act"), 18 U.S.C. § 3161 et seq., and continued the trial to May 19, 1992. Yoon, Smith, and Caravaggio pleaded guilty before trial. At trial, the jury returned a verdict of not guilty as to Schill and guilty as to Dota. From various decisions of the district court relating to the trial and Dota's sentence, Dota appeals.

## DISCUSSION

### 1. The Speedy Trial Act

■ Dota argues that his trial did not begin soon enough to satisfy the Act. This court reviews "the district court's findings concerning the Act for clear error and questions concerning application of the Act *de novo.*" *United States v. Nash,* 946 F.2d 679, 680 (9th Cir.1991).

"The Speedy Trial Act provides a seventy day limit from the date of the ... indictment or the date on which the defendant appears before a judicial officer of the court, whichever occurs last, to the commencement of the trial. Certain periods of time are excludable." *Nash,* 946 F.2d at 680 (citations omitted). Delay "resulting from any pretrial motion," from the filing of the motion through the disposition of it, is excluded. 18 U.S.C. § 3161(h)(1)(F). The Act also excludes delay "resulting from a continuance granted by any judge ... on the basis of his findings that the ends of justice ... outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). Findings supporting an "ends-of-justice" exclusion of time must appear in the record and be "supported by the record" with reference to factors set forth in 18 U.S.C. § 3161(h)(8)(A) & (B). *United States v. Jordan,* 915 F.2d 563, 565 (9th Cir.1990); *United States v. Pollock,* 726 F.2d 1456, 1461 (9th Cir.1984).

The district court justified the continuance in this case, over Dota's objection, on grounds that (1) Dota's codefendants needed more time to review large amounts of documentary and tape discovery, do follow-up investigation, and prepare for trial; and (2) the government needed more time to complete its receipt and analysis of various necessary records, including telephone tolls, credit card receipts, bank records, and hotel records; to conduct follow-up investigation in Orange County, Las Vegas, and San Francisco; and then to prepare for trial. The court specifically found that interests of justice outweighed the interests of the public and the defendants and that 70 days would deny counsel for defendants and the government the reasonable time necessary for effective preparation, taking into account due diligence. *See* 18 U.S.C. § 3161(h)(8)(B)(iv) (allowing a continuance when reasonably necessary for the defendant or the government to prepare for trial).

Dota claims that these factual findings were error. Specifically, he asserts that codefendants' and the government's attorneys did not really need extra time. Dota also argues that this case is like *United States v. Theron,* 782 F.2d 1510 (10th Cir.1986). In *Theron,* the court held that the district court must balance justice against the interests of

"the defendant" and the public, not codefendants, and that an ends-of-justice continuance based on codefendants' needs was ineffective. 782 F.2d at 1513. Dota argues that, as in *Theron,* the needs of Dota's codefendants were irrelevant.

Dota also challenges the district court's finding that February 10th (the date codefendants Yoon, Smith, and Caravaggio were arraigned) was the date on which Dota's speedy trial clock began to run. Though recognizing that generally the clock begins to run when the last codefendant appears in court, *Henderson v. United States,* 476 U.S. 321, 323 n. 2, 331, 106 S.Ct. 1871, 1873 n. 2, 1877, 90 L.Ed.2d 299 (1986); *United States v. Morales,* 875 F.2d 775, 776 (9th Cir.1989), Dota contends the case at bar should be an exception to that general rule because (1) the three codefendants who appeared on February 10th were going to be government witnesses; (2) all three pleaded guilty shortly thereafter; and (3) the time when the three appeared was uniquely within the control of the government (the three were brought into federal custody from state custody by means of habeas corpus writs).[1] Dota argues the clock actually began to run on January 27, 1992, when Dota was arraigned. Dota's trial did not begin until 77 days after January 27, 1992, excluding delay resulting from the disposition of filed motions. Dota claims the extra seven days warrant dismissal.

We reject Dota's arguments and hold that Dota was brought to trial within the Act's limits. Dota's speedy trial clock did not begin to tick until February 10th, when Dota's codefendants first appeared in federal court. The district court found that the delay from January 27th to February 10th, 14 days, was a "reasonable time." The purpose for the delay was to bring the codefendants into federal court from state custody. Because the 14–day delay was reasonable, *see United States v. Winfrey,* 900 F.2d 1225, 1227 (8th Cir.1990) (holding reasonable a 19–day delay to bring codefendants into court); *United States v. Pena,* 793 F.2d 486, 488–90 (2d Cir.1986) (holding reasonable at least a 25–

day delay resulting from an inability to apprehend codefendants; listing cases involving longer delays), this case presents no facts warranting a departure from the established rule that the speedy trial clock begins to tick on the date the last codefendant appears. If Dota's speedy trial clock began to tick on February 10th, Dota was brought to trial well within the 70–day limit, excluding days in which filed motions remained pending.

The government concedes that had it taken undue advantage of its power to delay trial by failing to bring Yoon, Smith, and Caravaggio into court, the 14–day delay would not have been reasonable. The district court's finding implies that no such undue advantage was taken, however, and Dota cites no fact indicating that delay occurred for any such unreasonable purpose. We find that the district court's finding was justified.

As an alternative basis for our decision, we hold that the district court's decision relative to the continuance was justified. An ends-of-justice continuance may be justified on grounds that one side needs more time to prepare for trial. 18 U.S.C. § 3161(h)(8)(B)(iv). Though the government concedes that this case was not "complex" as that term is defined in § 3161(h)(8)(B)(ii), preparation of the factual record here was unusually complicated and required additional time. Moreover, the district court properly considered the needs of codefendants' counsel. *United States v. Butz,* 982 F.2d 1378, 1381 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993). In *Butz,* the district court granted Butz's codefendants' motion to continue the trial due to complexity. Butz opposed a continuance. This court held that "trial delay due to the [ends-of-justice] continuance granted to ... codefendants applies to [the defendant] as excludable time." *Id.* at 1380–82 (holding a delay of over 120 days to be reasonable); *United States v. Calabrese,* 825 F.2d 1342, 1347 (9th Cir.1987); *United States v. Fogarty,* 692 F.2d 542, 546–47 (8th Cir.1982) (hold-

1. Dota also contends that the government did not suggest below that the clock should begin to run on February 10th, until the government submitted the continuance order to the district court for the district court's signature. In fact, the government did suggest this idea to the court when the motion was argued orally.

ing a 31–day delay reasonable), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983). For these reasons, Dota has failed to show that the district court's factual finding in support of the continuance was clearly erroneous.

## 2. Outrageous Governmental Conduct

■ "A motion to dismiss an indictment based on [outrageous governmental conduct presents] a question of law reviewed *de novo*"; factual findings are reviewed for clear error. *United States v. Bonanno,* 852 F.2d 434, 437 (9th Cir.1988) (quotation attributions omitted), *cert. denied,* 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989).

Dota claims that the government's use of Yoon before and at the trial was outrageous governmental conduct warranting dismissal of the case against Dota. At the time Constable was attacked and thereafter, Yoon was on federal parole. As a condition of parole, Yoon had agreed "not [to] enter into any agreement to act as an 'informer' or special agent for any law enforcement agency." Dota claims the policies underlying this parole condition are two: (1) the parolee's safety and (2) to make sure the parolee does not commit new crimes and then try to buy his way out by informing. Dota claims these policies were violated by the government's use of Yoon in this case, and that the government's acts therefore constitute outrageous governmental conduct. Dota cites no case law holding such conduct to be outrageous.

The government in rebuttal notes first that the district court held that Yoon was not an informer. The district court accepted testimony that an informer was an individual "out there floating around in the streets, gathering tidbits of information, and ... passing the word to the handler to ... help [him] keep abreast of what's going on in the community, and in the case of a particular crime, to even possibly join in that crime or parts of it." The district court held that Yoon was instead a "cooperating coconspirator," in police custody at the time, a criminal who turned state's evidence. Moreover, the court noted that Yoon had already committed many crimes while on parole, so the policy to keep him away from crime was inapplicable.

In accord with the district court's conclusions, the government argues that Yoon was not an informer. The government cites *United States v. Hoyos,* 573 F.2d 1111 (9th Cir.1978), in which this court defined informer to mean generally one who "is ... paid for his services, or, having been a participant in the unlawful transaction, is granted immunity in exchange for his testimony." *Id.* at 1116 (quotation attributions omitted).

Moreover, the government notes that, to warrant dismissal, government conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Garza–Juarez,* 992 F.2d 896, 904 (9th Cir.1993) (quotation attributions omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994); *Bonanno,* 852 F.2d at 437. The government claims that its use of Yoon was not so shocking, citing *United States v. Simpson,* 813 F.2d 1462 (9th Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 and *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); and *United States v. Van Winrow,* 951 F.2d 1069 (9th Cir.1991). In *Simpson,* this court held that the FBI's use of a woman informer who became sexually involved with the defendant during the investigation did not constitute outrageous conduct. 813 F.2d at 1465–68. In *Van Winrow,* this court held that "[p]rosecutors may allow some defendants to cooperate in exchange for a lesser sentence because their cooperation is necessary to convict other criminals." 951 F.2d at 1073.

We affirm the district court on this issue. Though *Hoyos* does not address parole conditions, *Hoyos* indicates that the district court correctly construed "informer" and decided that Yoon was not one. Even if Yoon were an informer, however, the prosecution's use of Yoon was not so shocking as to violate the universal sense of justice. In *United States v. Smith,* 924 F.2d 889 (9th Cir.1991), this court noted that the following fall short of outrageous conduct: government supply of the contraband at issue in a narcotics offense; commission by an undercover agent of an offense equally serious to that charged; and assistance and encouragement of escape attempts. *Id.* at 897. The government's use

of Yoon is far less extreme than these acts or the conduct involved in *Simpson*. Even if such conduct were outrageous as it concerned Yoon (though it is not), it was not outrageous with respect to Dota.

### 3. The Pucci Subpoena

Dota claims that a Los Angeles Police Dep't ("LAPD") file containing information about Pucci should have been disclosed to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Some evidence indicated Pucci might have been involved in the conspiracy to murder Constable. Although the government took no position on whether the materials should be disclosed, LAPD attorneys objected to their release. The district court, after reviewing the Pucci records *in camera*, ruled that they were irrelevant to this case. Dota requests that this court review the Pucci records and determine whether the district court erred. Dota correctly states that the evidence is relevant "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *id.* at 685, 105 S.Ct. at 3385 (White, J., concurring).

This court has "not employed a single standard of review where there have been challenges to a conviction based on a *Brady* violation." *United States v. Brumel–Alvarez*, 991 F.2d 1452, 1456 (9th Cir.1992). The court has employed de novo review in most cases but has also reviewed for clear error and abuse of discretion. *Id.*

We have reviewed the LAPD file at issue. We find in it no materials relevant to Dota's case under the *Bagley* standard. We would affirm the district court's decision whether we reviewed it de novo or for abuse of discretion. We therefore need not and do not attempt to resolve the confusion relating to which standard of review is applicable.

### 4. Evidentiary Issues

Dota challenges the introduction of several items of testimony under Federal Rule of Evidence 403. A district court's Rule 403 determinations are reviewed for abuse of discretion. *United States v. Skillman*, 922 F.2d 1370, 1373 (9th Cir.1990), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991).

#### a. The Mafia Statements

■ The prosecution introduced into evidence, over Dota's objection, statements by four witnesses (Asher, Christman, McAllister, and Yoon) that indicate that Dota had a connection with organized crime. Dota claims that this evidence should have been excluded under Rule 403 because its prejudicial effect substantially outweighed its probative value. Dota claims that indications that he has mafia connections prejudicially show that he was more likely to commit murder for hire, the crime for which he was convicted. In support, Dota cites *United States v. Gillespie*, 852 F.2d 475, 478–79 (9th Cir. 1988), in which this court ruled that evidence of a defendant's homosexuality was unduly prejudicial under Rule 403.

We affirm the district court on this point. Three of the four witnesses (Asher, Christman, and McAllister) who Dota claims testified objectionably stated only that defendant Schill made statements indicating that Dota had mafia connections. The district court held this testimony was probative of what Schill thought of Dota. Schill indicated at one point in the trial that Dota's demeanor gave one the impression that Dota tried to act like a mafioso. Why Schill would do business with Dota and whether Schill would hire Dota to murder Constable were certainly at issue in the case. What Schill thought of Dota was relevant to whether Schill would enter with Dota into either a business contract or a contract to kill. The evidence was therefore probative.

Moreover, the jury heard testimony that Dota had collected debts through intimidation and force and that Dota played a leading role in the conspiracy to murder Constable. In this context, the testimony of Asher, Christman, and McAllister that Schill

thought Dota had mafia connections was not unduly prejudicial. *United States v. Fagan,* 996 F.2d 1009, 1015 (9th Cir.1993) (holding that a brief reference to the defendant's gang membership was probative and not unduly prejudicial); *Skillman,* 922 F.2d at 1373–74 (holding that evidence indicating the defendant had associated with skinheads was probative and not unduly prejudicial).

Yoon's testimony indicating that Dota had mafia connections was also relevant. When Dota's counsel cross-examined Yoon, Yoon said that he had stated post-arrest that the murder was contracted by Pucci. (Dota tried to defend himself in large measure by trying to pin the conspiracy on Pucci.) On re-direct, the prosecution sought to clarify that Yoon's post-arrest statement was based on speculation. In explaining that the post-arrest statement was speculation, Yoon essentially engaged in more speculation that Dota's killing Constable might have benefitted Dota by putting Dota in a favorable light with mafia in Ohio. The testimony was thus relevant to one of Dota's defenses. Once it became apparent in the courtroom what Yoon was saying, Schill's counsel objected, and the district court stopped the testimony. The district court allowed the testimony to stand on the record, however, because the testimony explained the speculative nature of Yoon's post-arrest statement.

Considering that the jury also heard testimony that Dota was involved in collecting debts by force and that others thought Dota acted as if he had mafia connections, for the jury to hear once again that someone else, Yoon, thought Dota had mafia connections was not unduly prejudicial. The trial court therefore did not abuse its discretion. *Gillespie* is distinguishable; in *Gillespie* the evidence at issue was less probative than was the evidence at issue in this case.

b. The Palm Springs Evidence

■ The district court allowed the prosecution to play to the jury taped conversations between Yoon and Dota. In one conversation, Dota related to Yoon that Dota was once arrested in Palm Springs while he had 18 different identification cards in his possession. At the time, Dota said, there were

warrants out for his arrest. Dota also claimed that this arrest led to time in Leavenworth prison but that he eventually was released because he feigned ignorance. Dota claims that this story, particularly in connection with the other references to Dota and the mafia, was unduly prejudicial under Rule 403.

We find no abuse of discretion in the district court's decision to allow the evidence. Dota's story was intended to convince Yoon to say nothing to the police. After Yoon's arrest, Yoon told Dota at the direction of government agents that he, Yoon, had been arrested for providing a police officer with a false name. Yoon said he was concerned because the police had also asked him questions about the murder. Dota told Yoon that the best method to "beat the rap" was to say nothing, and related the story above in support of this strategy. Throughout the tape-recorded phone conversations, Dota frequently denies any knowledge of the attempted murder of Constable.

As the government notes, the jury's understanding of Dota's Palm Springs story is crucial to their understanding of Dota's method of feigning ignorance on the phone with Yoon. In fact, given (1) the story, (2) the numerous times Dota disclaimed on the phone with Yoon any knowledge of the attempted murder, and (3) other details of the phone conversations indicating that Dota did have knowledge of the attempted murder, the jury might well have concluded that Dota in the phone conversations confessed his involvement. The conversations corroborated Yoon's testimony that Dota led the conspiracy. Thus, the Palm Springs story in connection with the rest of the phone conversations was quite probative. Any prejudice resulting from the jury's hearing the story was insufficient to outweigh its great probative value. Moreover, the Palm Springs incident involved a relatively minor crime, and the jury was given a cautionary instruction.

5. Government's Closing Argument

■ Dota claims that the prosecution unfairly manipulated closing argument. The district court allowed the prosecution to use in closing argument edited versions of the

tapes that were introduced into evidence. The edited portions were actual portions of the longer conversations, but Dota claims the edited versions were unfair and misleading. In support, Dota cites only *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), for the proposition that the prosecution has a duty to play fair.

We are not persuaded. The prosecutor has a "wide latitude" in closing argument. *United States v. Foster,* 711 F.2d 871, 883 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). "Improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *Id.* (internal quotations omitted). The government edited the tapes to ensure that the proper portions were played to the jury. The district court held that the government had fairly selected the most convincing material from the tapes, as it was entitled to do. Dota was entitled, if he wished, to select and play material from the tapes that neutralized or rebutted those parts played by the government. Dota has failed to show that the tapes as presented during closing argument indicated anything to the jury other than that Dota was guilty. The government was entitled to marshal evidence in its favor. The government's presentation of the tapes was proper.

### 6. The Verdict

■ Dota argues that his guilty verdict was "impossible." He claims that the government's theory of the crime rested on the involvement of Schill and that Schill's acquittal means the crime was not committed as charged. Dota points out that the government argued to the jury that Schill was the only one with a motive to kill Constable. Dota also argues that without Schill, there was no conspiracy.

Dota also claims that, although the jury may have reached the same verdict had the government charged a different agreement, the indictment may not be amended at this time to delete the agreement between Dota and Schill and allege some other agreement. In support, Dota cites *United States v. Lo-key,* 945 F.2d 825 (5th Cir.1991), in which the Fifth Circuit said that an impermissible constructive amendment of the indictment occurs when "the jury is permitted to convict the defendant upon a factual basis that effectively modifies an *essential element* of the crime charged." *Id.* at 830–31 (internal quotations omitted) (emphasis in original).

■ We reject Dota's arguments. Dota's arguments are founded on the notion that Schill's not-guilty verdict was inconsistent with Dota's guilty verdict. Dota claims his conviction is impossible only because Schill was acquitted. An inconsistent verdict is not a ground for acquittal or reversal of a conviction, however. *See United States v. Hart,* 963 F.2d 1278, 1280–82 (9th Cir.1992). That Schill was acquitted does not mean that the jury convicted Dota on a factual basis different from that alleged in the indictment. Rather, as *Hart* recognizes, it may mean that Schill was erroneously acquitted. *See id.* In either case, the rule in *Hart* and *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), prohibits this court from deciding which occurred. Jury verdicts are insulated from review for inconsistency. *Powell,* 469 U.S. at 68–69, 105 S.Ct. at 478–79.

### 7. Sentencing Facts

■ This court reviews the district court's factual findings relating to sentencing for clear error. *United States v. Notrangelo,* 909 F.2d 363, 364 (9th Cir.1990); *United States v. Carvajal,* 905 F.2d 1292, 1295 (9th Cir.1990); *United States v. Christman,* 894 F.2d 339, 342 (9th Cir.1990).

### a. Dota/Yoon and Dota/Schill or Dota/X

■ Dota contests many of the facts set forth in the Presentence Report ("PSR"), which were adopted by the district court. Specifically, the PSR outlines in paragraphs 25 and 28–44 the government's view of the case, including the relationship between Yoon and Dota and the part played by Schill. Dota argues that the agreement between

Dota and Yoon was not proved at trial. Dota claims that the jury's acquittal of Schill precluded the district court from finding that Schill was involved.

As to the Dota/Yoon agreement, the district court held that a preponderance of the evidence at trial showed allegations of Dota's involvement with Yoon to be true. As to Dota/Schill, the district court thought one could not tell what the jury thought of Schill solely by looking at the acquittal. Nonetheless, the district court held that a preponderance of the evidence showed Schill's involvement. The court reasoned that allegations involving Schill were probably irrelevant, however. Specifically, the court thought that evidence introduced at trial showed that at least one other person besides Dota, Yoon, Smith, and Caravaggio was involved, whether Schill or some other person. Yoon testified that Dota gave several reasons for ordering Constable killed, and nearly all of those reasons would have involved another person with a motive to kill Constable.

The government notes that Schill's acquittal cannot be used to disprove facts relating to Dota's conviction because *Powell* precludes such an analysis. The government points out that no one knows precisely why Schill was acquitted. Without asking the jurors to explain their decision, something courts generally will not do, "assessment of the reason for . . . inconsistency [in a verdict] would be based . . . on pure speculation." 469 U.S. at 66, 105 S.Ct. at 477.

We affirm the district court's factual findings. The findings regarding Dota and Yoon were strongly supported by evidence introduced at trial and so cannot be said to be clearly erroneous. As to the district court's findings regarding the involvement of Schill or another person, those too are supported by the evidence at trial. As to Schill specifically, *Powell* prohibits speculation as to the reasons for Schill's acquittal. As to a third person other than Schill, Yoon's testimony generally, Yoon's report of Dota's reasons for the attempted murder, and Dota's conduct as reported by Yoon all support the notion that Dota was acting at the direction of another, be that Schill, Pucci, or someone else. The second superseding indictment charged that

"others . . . unknown" were involved in the conspiracy. That some person other than Schill was involved, if Schill was not, is supported by the evidence.

### b. Offer or Receipt of Pecuniary Value

▇ The district court found that "money was exchanged to carry out the crime." Accordingly, the district court added four levels to Dota's base offense level. U.S.S.G. § 2A2.1(b)(2). Dota argues that the district court's finding should not stand for three reasons: (1) the finding depended on Yoon's testimony, which was disputed (Yoon may have lied); (2) the $21,000 payment to Dota was for legitimate business reasons; and (3) the payment of the money was only a "minuscule part of the conspiracy charged."

We will not disturb the district court's finding. The district court's determination was supported by the evidence. Credibility determinations should not be disturbed on appeal. *United States v. Kaufman,* 862 F.2d 236, 238 (9th Cir.1988). The district court was entitled to believe Yoon if it found Yoon's testimony credible.

### c. Leadership Role

▇ The district court found that Dota played a leadership role in this crime and that the crime involved five or more participants. The district court therefore increased Dota's offense level by four levels under U.S.S.G. § 3B1.1(a). Dota contends that no evidence showed Dota had knowledge or control of Caravaggio and Smith. Dota argues that even if evidence supported Dota's knowledge of Yoon's and Schill's involvement, Dota could not foresee that Smith and Caravaggio would become involved. Dota therefore claims that the district court's finding that Dota was a leader cannot stand. In support, Dota cites *United States v. Mares–Molina,* 913 F.2d 770 (9th Cir.1990), in which this court said that "some degree of control or organizational authority over others is required in order for section 3B1.1 to apply." *Id.* at 773. Dota argues that only Yoon had such authority over Smith and Caravaggio.

Dota also claims that the government has not shown that five people participated.

Dota claims that, with Schill's acquittal, only four participants were shown: Dota, Yoon, Smith, and Caravaggio. In support, Dota cites application note (1) to § 3B1.1, which says, "A person who is not criminally responsible for the commission of the offense ... is not a participant."

Dota also analogizes this case to *United States v. Markovic*, 911 F.2d 613 (11th Cir. 1990). In *Markovic*, the conviction of Markovic's coconspirator was reversed for insufficient evidence. Because only Markovic's supervision of this coconspirator supported the district court's finding that Markovic was a leader, the court of appeals determined that Markovic was not a leader when it concluded that the coconspirator committed no crime. 911 F.2d at 616–17; *see also United States v. Pigrum*, 922 F.2d 249, 256 (5th Cir.) (making a similar decision), *cert. denied sub nom.* `Allen v. United States*, 500 U.S. 936, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991).

We affirm the district court. Section 3B1.1 does not require that Dota knew of or exercised control over all of the participants. Rather, the section requires a finding only that Dota was an "organizer or leader" of a criminal activity that involved five or more participants. In *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir.1993), *cert. denied*, ___ U.S. ___, 115 S.Ct. 96, ___ L.Ed.2d ___ (1994), this court held that "[t]he fact that [the defendant] did not supervise more than one participant does not preclude the enhancement as a matter of law." This court affirmed Barnes's leadership role even though Barnes supervised only one other participant. *Id.* Here Dota recruited, supervised, and controlled Yoon.

Dota also cites no real authority for the proposition that all five participants must be foreseeable.[2] Section 3B1.1 does not mention foreseeability and does not appear to require it. Even if foreseeability were required, the district court's finding that Dota should have foreseen that Yoon would hire other people was not clearly erroneous.

In addition, Schill may still be a participant in criminal activity even though not criminal-

ly convicted. U.S.S.G. § 3B1.1 appl. n. 1. *Markovic* and *Pigrum* are distinguishable. In *Markovic*, the court found that the coconspirator could not form a criminal intent and therefore was not criminally responsible. In *Pigrum*, the court found insufficient evidence to convict the participant. Here, however, the reasons for Schill's acquittal are unclear, but the district court justifiably concluded that Schill's involvement was proved by a preponderance of the evidence. Under these circumstances, Schill may yet be considered "criminally responsible," as that phrase is used in the guidelines, for purposes of sentencing Dota. Alternatively, even if Schill were not considered a participant, the district court properly found that a fifth participant was present, whether Schill or someone else who hired Dota.

#### d. Obstruction of Justice

■ The district court determined that Dota attempted to obstruct justice, and therefore increased Dota's offense level by two levels under U.S.S.G. § 3C1.1. The district court based its conclusion on evidence that Dota instructed Yoon to (1) lie to law enforcement authorities and (2) tell Smith and Caravaggio not to disclose the plan to murder Constable or they "might not even get there." The district court apparently thought "there" referred to "jail."

Dota takes issue with (2). He claims that under the case law, this statement is too ambiguous to be a threat. In support, Dota cites a number of cases in which more obvious and clearly stated threats were held to be threats. He also cites *United States v. Tuck*, 964 F.2d 1079 (11th Cir.1992), in which a bank robber's statement, "Don't do anything funny or I'll be back," was held to be too ambiguous to warrant a sentence enhancement. Dota further argues on grounds of lenity that ambiguous statements should not warrant any type of enhancement.

We affirm. *Tuck* is distinguishable. *Tuck* involved a provision of the sentencing guidelines requiring "an express threat of death." 964 F.2d at 1080–81; *see* U.S.S.G.

---

2. The case Dota cites, *United States v. Fuentes*, 991 F.2d 700 (11th Cir.1993), involved a determination of whether coconspirator conduct was foreseeable such that the defendant could be held responsible for it. Section 3B1.1 was not mentioned by the court.

§ 2B3.1(b)(2)(D) (1990) (currently § 2B3.1(b)(2)(F) (1993)). That requirement is not present in § 3C1.1. Rather, as the government notes and as this court held in *United States v. Jackson,* 974 F.2d 104 (9th Cir.1992), § 3C1.1 is far broader.

In *Jackson,* the defendant Jackson received a copy of an agreement that a friend, Pittman, had signed, which obligated Pittman to cooperate with the government in investigating Jackson. Jackson wrote on the top of the agreement, "The 'Rat' Fred Pittman," and below that, "Snitch." Jackson gave copies to his sister, a minister, and Pittman's mother. Evidence indicated that Jackson circulated the agreement at a restaurant, too. Jackson said he did not intend to hurt Pittman but only to prove to Pittman's mother that Pittman had been responsible for Jackson's arrest. The district court found that Jackson's actions were a threat and were intended to chill Pittman's willingness to cooperate in the future. *Id.* at 105. This court affirmed. The court reasoned, "Where a defendant's statements can be reasonably construed as a threat, even if they are not made directly to the threatened person, the defendant has obstructed justice." *Id.* at 106. *Jackson* shows that § 3C1.1 does not require that conduct obstructing justice be unambiguous.

We conclude that a broad range of conduct can constitute obstruction of justice. Application note 3(a) to § 3C1.1 notes that "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness, ... directly or indirectly, or attempting to do so," constitutes obstruction of justice. The district court's finding that Dota threatened Smith and Caravaggio through Yoon is not clearly erroneous. Moreover, even if it were, Dota's instruction to Yoon to lie to authorities was sufficient to support the finding that Dota had attempted to obstruct justice.

AFFIRMED.