UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 94-1780

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 MAXIMO E. TEJADA-BELTRAN, ALIAS, ETC.,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Juan M. Perez-Gimenez, U.S. District Judge] 

 

 Before

 Torruella, Chief Judge, 

 Coffin, Senior Circuit Judge, 

 and Selya, Circuit Judge. 

 

 Jose M. Feliciano-Valera on brief for appellant. 
 Guillermo Gil, United States Attorney, Jose A. Quiles- 
Espinosa, Senior Litigation Counsel, and Jeanette Mercado-Rios, 
Assistant United States Attorney, on brief for appellee.

 
 March 31, 1995
 

 SELYA, Circuit Judge. This is another in the ever- SELYA, Circuit Judge. 

lengthening queue of sentencing appeals that have crowded federal

appellate dockets since the advent of guideline sentencing.

After carefully considering appellant's asseverations, we affirm.

I. BACKGROUND I. BACKGROUND

 Because appellant's conviction and sentence stem from a

guilty plea rather than a trial, we derive the pertinent facts

from the presentence investigation report (PSI Report) and the

transcripts of the change-of-plea and disposition hearings. See 

United States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991). 

 On September 20, 1993, federal authorities arrested two

women, both of whom were citizens of the Dominican Republic, at

San Juan's principal international airport.1 The women had

unsuccessfully attempted to gain entry into the United States

using ersatz passports. In short order, the authorities

determined that defendant-appellant Maximo E. Tejada-Beltran

(Tejada) had furnished the bogus documents and had offered to pay

a student apprentice employed on a part-time basis by the

Immigration and Naturalization Service (INS) $1,000 per head to

ensure his clients' unlawful entry.

 On September 24, the apprentice arranged a meeting

between Tejada and an undercover agent. During the course of

this session, appellant offered to pay the agent, who was posing

as a corrupt INS inspector, a bounty of $1,000 for each alien who

  

 1All events occurred in 1993 unless otherwise specifically
indicated.

 2

was permitted to sneak into the United States from the Dominican

Republic. The men struck a deal. Appellant suggested that the

bribes be paid at the inspection booth coincident with the

illegal entries and forecast that clients would begin to arrive

between September 26 and October 2.

 On October 2, appellant spoke with the agent, told him

he had scheduled an arrival for the next day, described the

traveller, and confirmed that he would be carrying a fraudulent

passport made out in an assumed name. Appellant informed the

agent that the alien would pay him upon arrival. On October 3,

the alien reported to the inspection booth and handed the agent

an envelope containing $1,000 in cash. The agent thereupon

facilitated the smuggle. That evening, appellant confirmed his

client's successful entry and told the agent that his father, who

lived in Puerto Rico, would retrieve the fraudulent passport so

that it could be recycled for future use. He also speculated

that, in the future, his father, rather than his clients, might

make the payoffs to the agent.

 In the weeks that followed, appellant identified a

steady stream of clients to the agent, regularly promising to pay

him $1,000 for each illegal alien who entered without incident.

These arrangements were consummated client by client, on

different dates. On each occasion appellant provided the agent

with the name and description of the alien or aliens in question,

the anticipated arrival date, and a suggested method of payment.

For example, on October 7, appellant arranged for the agent to

 3

admit two clients bearing resident alien cards that belonged to

relatives. The next day, when the aliens gained entry, each of

them delivered an envelope containing $1,000 to the agent.2

 Appellant often boasted about his connections. He told

the agent that he had people in Puerto Rico who would pay United

States citizens to petition the State Department for passports or

kindred documents, and then turn them over to appellant for use

in his nefarious scheme. Appellant also bragged about a wide

array of quondam accomplices: a person who had access to

sophisticated machinery that could be used to alter authentic

documents, such as United States passports and alien registration

cards, and who would forge documents for him in the Dominican

Republic; two immigration inspectors at airports in the Dominican

Republic who accepted bribes to assist in the smuggles; a person

in New York who would facilitate the illegal immigration of

aliens entering the country via New York; and an individual in

Miami who, on request, would obtain "secure" ink (supposedly

available only to the government) that could then be used to

doctor United States passports. In addition to this cadre of

confederates, appellant also mentioned that he would from time to

time hire attorneys to represent aliens caught in the toils when

planned entries went awry.

 Between October 16 and November 6, appellant negotiated

the illegal entry of at least seven more clients. When,
  

 2Notwithstanding the agent's efforts, the authorities
arrested one of these men when they discovered he had a prior
felony conviction in the United States.

 4

thereafter, appellant told the agent that he wanted two

particular aliens admitted, and that he, personally, would pay

$2,000 to smooth the way, the INS decided to spring the trap. The

authorities arrested appellant on November 16 while he was

delivering the $2,000 gratuity to the agent. At the time of his

apprehension, arrangements had already been made for the illegal

entry of three more aliens (scheduled to arrive later that day).

 In a matter of weeks, a federal grand jury handed up a

22-count indictment (summarized in the Appendix). The first ten

counts charged appellant with encouraging or inducing specified

aliens illegally to enter the United States, in violation of 8

U.S.C. 1324(a)(1)(D); the next five counts charged appellant

with furnishing altered passports to specific aliens to be used

to gain admittance into the United States, in violation of 18

U.S.C. 1543; and the remaining seven counts charged appellant

with bribery of a public official, in violation of 18 U.S.C. 

201(b)(1)(C).

 After some preliminary skirmishing (not relevant here),

appellant pled guilty to four counts of encouraging or inducing

aliens illegally to enter the United States (counts 1, 3, 5, 6),

three counts of furnishing altered passports (counts 11, 13, 14),

and three counts of bribery (counts 16, 17, 18). On June 24,

1994, the district court convened the disposition hearing.3
  

 3A sentencing court customarily applies the guidelines in
effect on the date of sentencing. See United States v. Bell, 953 
F.2d 6, 7 (1st Cir. 1992); United States v. Harotunian, 920 F.2d 
1040, 1041-42 (1st Cir. 1990). Accordingly, this case is
governed by the November 1, 1993, edition of the guidelines, and

 5

Relying for the most part on the findings and recommendations

contained in the PSI Report, the court treated the bribery counts

as predominant; set the base offense level at 10, see U.S.S.G. 

 2C1.1, 3D1.3; raised it by two levels because appellant's

misconduct involved multiple bribes, see U.S.S.G. 2C1.1(b)(1); 

applied an increase of three more levels because the bribes, in

the aggregate, had a value in excess of $10,000, see U.S.S.G. 

 2C1.1(b)(2)(A), 2F1.1(b)(1)(D); added four more levels because

of appellant's role in the offense, see U.S.S.G. 3B1.1(a); and 

subtracted three levels for acceptance of responsibility, see 

U.S.S.G. 3E1.1. The district court then calculated the

guideline sentencing range at 21-27 months (offense level

16/criminal history category I); imposed a 27-month incarcerative

sentence (accompanied by a three-year term of supervised release

and a $500 special assessment); and dismissed the other twelve

counts contained in the indictment. This appeal followed.

II. ANALYSIS II. ANALYSIS

 On appeal, Tejada assigns error in two respects.4 We

address his claims seriatim. 

 A. Relevant Conduct. A. Relevant Conduct. 

  

all references in this opinion are to that version.

 4In the district court, appellant also argued that each of
the bribery counts represented installment payments referable to
a single bribe, and, hence, could not carry the weight of a two-
level increase under U.S.S.G. 2C1.1(b)(1). The court below
rejected this argument, and appellant has not renewed it on
appeal. Thus, we deem it to be waived. See United States v. 
Slade, 980 F.2d 27, 30 n.3 (1st Cir. 1992); United States v. St. 
Cyr, 977 F.2d 698, 701 (1st Cir. 1992). 

 6

 Appellant strives to persuade us that the record in

this case will not support a finding, by a fair preponderance of

the evidence, that the offense of conviction involved bribes

totalling more than $10,000. Since this exhortation challenges

the sentencing court's findings of fact, our review is for clear

error. See United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 

1992). We discern none.

 With respect to offenses involving bribery of public

officials, the sentencing guidelines use the amount of the bribe

offered or given as an important indicium in fixing the

defendant's offense level and, hence, the ultimate sentencing

range. See U.S.S.G. 2C1.1(b)(2)(A); 2F1.1(b)(1). The 

aggregate amount of the covered bribes is to be derived from the

sum total of all relevant conduct a datum that can be arrived

at only after consideration of all acts "that were part of the

same course of conduct or common scheme or plan as the offense of

conviction." U.S.S.G. 1B1.3(a)(2); see generally United States 

v. Sklar, 920 F.2d 107, 110 (1st Cir. 1990); United States v. 

Blanco, 888 F.2d 907, 910 (1st Cir. 1989). Assembling this 

compendium requires the sentencing court to consider both

consummated and unconsummated bribes. The failure to consummate

a bribe neither detracts from the donor's culpability nor renders

the amount involved ineligible for use in setting the donor's

offense level; the guidelines treat solicitations and attempts as

equivalent to completed offenses. See U.S.S.G. 2C1.1(b)(2)(A), 

comment. (backg'd).

 7

 At the disposition hearing, the lower court relied

heavily on the PSI Report. It concluded that appellant had

offered or given no fewer than twelve bribes, each in the amount

of $1,000. At bottom, this conclusion is the product of simple

multiplication: the price per alien times the number of aliens

smuggled.

 As to the first integer, the court could plausibly have

found the price to be $1,000, per head. After all, the record

indicates that appellant offered to pay the apprentice $1,000

apiece for the first two aliens admitted, and that he had an

ongoing agreement with the undercover agent to pay the same

price. These facts adequately ground an inference that appellant

offered or gave a $1,000 bribe for each client whom he endeavored

to smuggle into the United States.

 By like token, the court could plausibly have found

that no fewer than twelve aliens were involved. The court

identified the aliens it had in mind by reference to particular

incidents, citing the five client arrivals that undergirded

counts 1 through 5, all of which occurred between September 20

and October 8, and "at least seven" additional arrivals occurring

between October 16 and the first week in November.5 Appellant

would have us draw the line at those aliens specified in the
  

 5Tejada asserts for the first time on appeal that only five
illegal aliens entered between October 16 and November 6.
Because he did not advance this assertion below, he has waived
any right to raise the issue on appeal. See Dietz, 950 F.2d at 
55. At any rate, the assertion lacks force. It fails to
recognize that, in determining relevant conduct, the judge could
 and did go beyond the incidents described in the indictment. 

 8

counts of conviction, but this approach misperceives the method

of the guidelines. Relevant conduct is not limited to the counts

of conviction. It may include acts that were embodied in counts

originally charged but later dropped, see, e.g., United States v. 

Garcia, 954 F.2d 12, 15 (1st Cir. 1992), and acts that were never 

charged at all, see U.S.S.G. 1B1.3, comment. (backg'd). For 

present purposes, this means that the sentencing court, in

fashioning the three-level enhancement under section

2C1.1(b)(2)(A), could appropriately aggregate all bribes offered

or given by appellant as part of the same course of conduct as

the offense of conviction, whether or not charged in the

indictment and whether or not encompassed by his guilty plea.

 This gets the grease from the goose. On this record,

the sentencing court could certainly have included the ten aliens

mentioned in the indictment (including those aliens who were

mentioned in counts that were eventually dismissed). Although

appellant argues that the first two incidents, in which he dealt

with the student apprentice rather than the undercover agent,

were outside the scope of relevant conduct, and, hence, not

properly includable, we believe that the court below had ample

room to reach the opposite conclusion. Because the apprentice

introduced Tejada to the undercover agent, we think that the

court could rationally have viewed the serial bribes as part of a

single scheme and aggregated all the entries under the relevant

conduct rubric.

 Over and above these ten, the court also enumerated two

 9

other aliens for whose entry appellant negotiated with the

undercover agent during the period from October 16 through

November 6. While these persons were not named in the

indictment, the PSI Report and the audiotapes of appellant's

conversations with the agent adequately support their inclusion.

No more is exigible. See United States v. Gonzalez-Vazquez, 34 

F.3d 19, 25 (1st Cir. 1994) (explaining that "[f]acts contained

in a presentence report ordinarily are considered reliable

evidence for sentencing purposes"); United States v. Morillo, 8 

F.3d 864, 872 (1st Cir. 1993) (same). If more were needed to

bell the cat, appellant was in the process of delivering a $2,000

bribe at the time of his arrest, and had three more smuggles in

the offing. Though these entries were not in fact accomplished,

they could nonetheless be counted in determining relevant

conduct.

 A sentencing court "need only make a reasonable

estimate of the loss, given the available information." U.S.S.G.

 2F1.1, comment. (n.8). Measured by this yardstick, the court

below had a sound basis both for concluding that appellant

attempted to facilitate the illegal entries of at least twelve

aliens, and for multiplying that number of aliens by $1,000 per

head to obtain the overall amount of the bribes offered or given

during the course of the scheme. Even if the record, read

generously to appellant, might conceivably support some less

damning scenario and we do not suggest that it can we would

not meddle. Our review is only for clear error and "where

 10

there is more than one plausible view of the circumstances, the

sentencing court's choice among supportable alternatives cannot

be clearly erroneous." United States v. Ruiz, 905 F.2d 499, 508 

(1st Cir. 1990).

 B. Role in the Offense. B. Role in the Offense. 

 U.S.S.G. 3B1.1(a) provides for elevating the offense

level of "an organizer or leader of a criminal activity that

involved five or more participants or was otherwise extensive" by

four levels. The district court seized upon this guideline and

hiked appellant's offense level on the theory that he was the

organizer of an extensive criminal enterprise. Appellant assigns

error because, in his view, the record fails to disclose that he

exercised any degree of control over others, that he brought

others together for the purpose of carrying out the crime, or

that the criminal activity encompassed five or more participants.

 Assessing a defendant's role in the offense is a fact-

specific task, suggesting by its very nature "that considerable

respect be paid to the views of the nisi prius court." United 

States v. McDowell, 918 F.2d 1004, 1011 (1st Cir. 1990) (quoting 

United States v. Ocasio, 914 F.2d 330, 333 (1st Cir. 1990)). It 

follows, therefore, that unless a mistake of law looms and we

see none here a sentencing court's determination of a

defendant's role will be set aside only for clear error. See id. 

 In order to invoke section 3B1.1(a), a district court

must make both a status determination a finding that the

 11

defendant acted as an organizer or leader of the criminal

activity and a scope determination a finding that the

criminal activity met either the numerosity or the extensiveness

benchmarks established by the guideline. See McDowell, 918 F.2d 

at 1011; United States v. Preakos, 907 F.2d 7, 9-10 (1st Cir. 

1990) (per curiam). Tejada's case easily passes both aspects of

the test.

 1. Status. Although the sentencing guidelines do not 1. Status. 

specifically define the term "organizer" as used in section

3B1.1, the commentary supplies a valuable clue. It tells courts

that "[t]his adjustment is included primarily because of concerns

about relative responsibility." U.S.S.G. 3B1.1, comment.

(backg'd); see generally United States v. Herrera, 878 F.2d 997, 

1000 (7th Cir. 1989). Because the Sentencing Commission

envisions large-scale criminal activities as hierarchical, the

guidelines punish the persons atop the pyramid more severely

based on their relative responsibility.

 To aid in the process of distinguishing top-echelon

roles from other, less culpable, managerial or supervisory roles,

the Commission directs judges' attention to seven factors

including "the exercise of decision making authority, the nature

of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share

of the fruits of the crime, the degree of participation in

planning or organizing the offense, the nature and scope of the

illegal activity, and the degree of control and authority

 12

exercised over others." U.S.S.G. 3B1.1, comment. (backg'd).

This list is intended to be representative rather than

exhaustive. See, e.g., United States v. Talladino, 38 F.3d 1255, 

1260 (1st Cir. 1994) (explaining that the seven telltales

identified in the Commission's commentary, while useful as

guideposts, do not possess "talismanic significance"). There

need not be proof of each and every factor before a defendant can

be termed an organizer or leader. See Preakos, 907 F.2d at 9; 

see also United States v. Rodriguez Alvarado, 985 F.2d 15, 20 

(1st Cir. 1993) (illustrating that a court appropriately may

enhance a defendant's offense level under 3B1.1(a) or (b)

despite the lack of any evidence as to one or more of the listed

factors).6 

 Appellant's most touted argument is that he cannot be

deemed an organizer because our decision in United States v. 

Fuller, 897 F.2d 1217 (1st Cir. 1990), requires a finding of the 

exercise of some degree of control over other individuals before

a defendant becomes eligible for any of the aggravating role

adjustments described in section 3B1.1. But appellant reads

Fuller through rose-colored spectacles. There, the defendant 

contended that he should not have received an upward role-in-the-

offense adjustment because the government adduced no proof that

he recruited anyone to assist him with his criminal activities,
  

 6In Rodriguez Alvarado, the district court enhanced the 
defendant's sentence although only three of the seven factors
(recruitment of accomplices, a substantial role in planning the
crime, and the extensive scope of the illegal activity) were
present.

 13

or that he directed other persons in carrying out criminal

activities. See Fuller, 897 F.2d at 1219. We vacated Fuller's 

sentence, concluding that

 in the absence of any evidence that Fuller
 exercised control over [other] persons or was 
 otherwise responsible for organizing them in 
 the commission of the offense, the mere fact 
 that Fuller had dealt with a large quantity
 of marijuana does not support a finding that
 he was an organizer, leader, supervisor, or
 manager.

Id. at 1221 (emphasis supplied). Thus, Fuller, properly read, 

stands for the proposition that section 3B1.1 "does not apply to

a defendant who merely organizes or supervises criminal activity

that is executed without the aid of others." Id. at 1220 

(emphasis supplied); see also Rodriguez Alvarado, 985 F.2d at 20 

(holding that the sentencing court did not err when it enhanced

appellant's sentence as a "manager or supervisor" based on his

role in planning and organizing a criminal scheme involving

others, despite the absence of any finding concerning appellant's

control over underlings or subordinates); see generally U.S.S.G. 

 3B1.1, comment. (n.2) (explaining that an upward adjustment

under 3B1.1 requires that "the defendant must have been the

organizer, leader, manager, or supervisor of one or more other 

participants") (emphasis supplied). Thus, Fuller does not help 

appellant; his crimes were not and could not have been 

committed without the complicity of others.

 Fuller aside, appellant posits that control over a 

minimum of four others (bringing the total number of criminally

culpable participants, including the defendant, to five) is a

 14

sine qua non for a finding that a particular person is an 

organizer within the ambit of section 3B1.1(a). In mounting this

steed, appellant in effect treats the terms "organizer" and

"leader" as synonymous, or, at the least, as functionally

equivalent. This lack of precision is arguably to his advantage

because some courts have required the exercise of direct control

over others as an attribute of leadership status.7 In the final

analysis, however, the terms cannot be casually conflated. The

language of section 3B1.1(a) is disjunctive. The guideline

demands the four-level increase so long as the defendant is

either "an organizer or leader." [Emphasis supplied].  

 This disjunctive usage cannot be written off as

linguistic happenstance. We can only assume that the Sentencing

Commission used both words "organizer" and "leader" because

it knew that they had distinct and disparate meanings. While the

term "leader" implies the exercise of some degree of dominance or
  

 7While a defendant may be classified as an "organizer" under
section 3B1.1(a) even if he did not personally control other
participants in an "extensive" criminal enterprise, see text 
infra, some courts have held that a defendant may not receive a  
3B1.1(a) enhancement as a "leader" unless he personally controls
at least four other participants or the criminal activity is
found to be "otherwise extensive." See United States v. Carson, 
9 F.3d 576, 584 (7th Cir. 1993), cert. denied, 115 S. Ct. 135 
(1994); United States v. Reid, 911 F.2d 1456, 1465 n.8 (10th Cir. 
1990), cert. denied, 498 U.S. 1097 (1991). It remains an open 
question in this circuit as to whether a defendant must
personally control a bare minimum of four other participants in
order to receive a section 3B1.1(a) enhancement as a "leader" of
criminal activity involving five or more participants, or whether
the two determinations leadership status and minimum number of
participants are made independently of one another. See, e.g., 
United States v. Dota, 33 F.3d 1179, 1189 (9th Cir. 1994), 
petition for cert. filed (U.S. Jan. 9, 1995) (No. 94-7604). 
Tejada's case does not require us to answer this question.

 15

power in a hierarchy, and also implies the authority to ensure

that other persons will heed commands by definition, one cannot

lead if no one follows the term "organizer" has a different

connotation. One may be classified as an organizer, though

perhaps not as a leader, if he coordinates others so as to

facilitate the commission of criminal activity. See Rodriguez 

Alvarado, 985 F.2d at 20 (finding enhancement warranted where 

"appellant played an important role in planning and organizing

the offense"); accord United States v. Varela, 993 F.2d 686, 691 

(9th Cir.) ("An enhancement may be proper where . . . a defendant

organizes others in the commission of the criminal activity even

though he does not retain a supervisory role over the other

participants."), cert. denied, 114 S. Ct. 232 (1993); United 

States v. Harry, 960 F.2d 51, 54 (8th Cir. 1992) ("[D]efendant 

need not have directly controlled others in the organization to

have functioned as an organizer."). The key to determining

whether a defendant qualifies as an organizer is not direct

control but relative responsibility. Cf., e.g., United States v. 

Skinner, 986 F.2d 1091, 1097-98 (7th Cir. 1993) (suggesting that 

in reviewing aggravating role enhancements, an appellate court's

principal focus must be on relative responsibility rather than

upon any one of the seven Commission-identified factors). When,

as now, the organizer stages an extensive activity in such a way

as to evince an increased degree of relative responsibility, the

four-level enhancement applies whether or not he retains

supervisory control over the other participants. See Varela, 993 

 16

F.2d at 691-92 (explaining that "[t]he enhancement reflects the

greater level of culpability of the participant who arranges the

transaction"); see also Rodriguez Alvarado, 985 F.2d at 20 

(finding enhancement warranted when the defendant's activities

"entailed an increased degree of responsibility for the

commission of the offense"). 

 In this instance, we think it is nose-on-the-face plain

that the sentencing court did not err in ranking appellant as an

organizer. The record attests, directly or by fair inference,

that appellant orchestrated the entire scheme, played a pivotal

role in committing the crimes, made decisions about when and

where unlawful entries would be attempted, recruited accomplices,

and retained a degree of control over at least one of them (the

document retriever). Viewed from any angle, he bears significant

responsibility for the scheme.8

 We hold that retention of control over other

participants, although sometimes relevant to an inquiry into the

status of a putative organizer, is not an essential attribute of

organizer status. Because an organizer is at bottom a person who

forms diverse elements into a whole consisting of interdependent,

coordinated parts, geared for concerted action, see, e.g., The 

Random House Dictionary of the English Language 1365 (2d ed. 
  

 8Indeed, at the disposition hearing, appellant freely
admitted that he alone was responsible for the "planning,
coordinating, and executing" of the scheme, the recruitment of
aliens, and the supply of documents to them. In light of this
admission, the district court aptly stated that "all these people
independently would not have produced a successful . . .
enterprise unless somebody was organizing the whole. . . ."

 17

1987), supervisory control lacks decretory significance. Here,

appellant acted as the very prototype of an organizer, serving as

a magnet to bring others together and thereby lend feasibility to

the commission of the crime. Hence, notwithstanding the lack of

any proof that he exercised direct supervision over his

confederates, his behavior satisfies the first prong of the test.

 2. Scope. The test's remaining prong is also 2. Scope. 

fulfilled. In the first place, the district court's

determination that the criminal enterprise was "extensive" is

solidly anchored in the record: the breadth of the activities,

whether measured in terms of duration, number of clients, or

geographic reach, argues persuasively to this end. See Dietz, 

950 F.2d at 53 (emphasizing importance of "width, breadth, scope,

complexity, and duration of the scheme"). Since the criminal

activity must meet either the extensiveness or the numerosity

benchmark, not necessarily both, a founded finding of

extensiveness, in and of itself, is enough to engage the gears of

section 3B1.1(a) even if the commission of the crime depended

upon fewer than five participants. See id.  

 In any event, the numerosity requirement is satisfied.

Although the district court did not name the other participants,

that omission is not fatal. It is not necessary that the

government prove the identities of the persons whom the organizer

organizes as long as the record permits the sentencing court to

make "a specific finding, based on a preponderance of the

evidence, which pinpoints [the participants] with enough

 18

particularity to give credence to the upward adjustment."

McDowell, 918 F.2d at 1011. The court here made such a finding, 

and it is well supported.

 Taking its cue from the PSI Report, and relying heavily

on appellant's boasts to the undercover agent, the sentencing

court listed no fewer than ten persons who participated in the

scheme. Though the inclusion of some of these persons may be

problematic, a goodly number clearly qualify: appellant

himself;9 the individuals who recruited passport applicants;

the forger; the person who retrieved the bogus documents after

they had been used; and the two immigration inspectors in the

Dominican Republic, to name a few. Since the number of

criminally culpable participants is at least five, the district

court did not err in increasing appellant's offense level.

III. CONCLUSION III. CONCLUSION

 We need go no further. For the reasons stated, the

defendant's conviction and sentence must be

Affirmed. Affirmed. 

  

 9The defendant himself can be counted as a participant for
purposes of the numerosity requirement. See Preakos, 907 F.2d at 
10.

 19

 APPENDIX APPENDIX

 Approximate Approximate
Counts Date of Offense Identity of Counts Date of Offense Identity of 
Alien Alien 

1, 11 9/20/93 Marisol Martinez, a/k/a
Lorraine Mercedes

2, 12 9/20/93 Zoila Cruz, a/k/a Lisa
Soto

3, 13, 16 10/3/93 John Doe, a/k/a Edwin
Ramirez Barreto

4, 17 10/8/93 Jose Eduardo Espinal

5, 18 10/8/93 John Doe, a/k/a Leoncio
Collado

6, 19 10/16/93 John Doe, a/k/a Jose
Ramon Cruz, a/k/a 
 Jose Ramon Cruz Nunez 

7, 14, 20 10/21/93 Jane Doe, a/k/a Elena
Guerrero

8 10/31/93 Fernando Antonio
Polanco, a/k/a Marco 
 Antonio Vasquez Ramos

9, 21 11/2/93 John Doe, a/k/a Jose
Rodriguez Lopez, a/k/a 

 20

 Marcos Antonio Vasquez Ramos

10, 15, 22 11/6/93 John Doe, a/k/a Jose
Alberto Gonzalez,
 a/k/a Jose Alberto
Morales

Note: counts 1-10 charge violations of 8 U.S.C. 1324(a)(1)(D);
counts 11-15 charge violations of 18 U.S.C. 1543; and counts
16-22 charge violations of 18 U.S.C. 201(b)(1)(C).

 21