**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sabulon Cardenas CUELLAR,
Defendant–Appellant.**

No. 95–50118.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 7, 1996.

Decided Sept. 17, 1996.

Joseph F. Walsh, Los Angeles, California, for defendant-appellant.

Duane R. Lyons, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.

Before: POOLE, WIGGINS, and
RYMER, Circuit Judges.

RYMER, Circuit Judge:

This appeal requires us to decide whether a contract to pay an undercover informant a percentage of funds laundered through organizations he penetrated is outrageous government conduct.

Sabulon Cardenas Cuellar was convicted on charges of distribution of 200 kilograms of cocaine and possession of one kilogram of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He complains of a number of errors, but principally contends that his due process rights were violated based upon the government's paying an informant a percentage of money seized in undercover operations, and making additional payments depend on the outcome of trial. We hold that a contingent fee arrangement is not by itself outrageous government conduct, and that in the circumstances of this case the district court did not err in finding that additional payments were not dependent on the outcome of Cuellar's trial. As there was no other reversible error, and we have jurisdiction over this timely appeal, 28 U.S.C. § 1291, we affirm.[1]

## I

"Operation Costa Del Oro" was a complex money-laundering investigation by the United States Customs Service (USCS) and a number of municipal law enforcement agencies across the country. As part of the investigation, the USCS entered into a Personal Assistance Agreement with Carlos Garavito, a confidential informant, in August 1993. The USCS agreed to process "purchase of information/purchase of evidence" (POI/POE) payments for Garavito's participation in the investigation, "predicated on the Source's participation in the investigation and the results of any subsequent criminal or civil proceedings." In return, Garavito agreed to forfeit his right to apply for an award under 19 U.S.C. § 1619[2] in specific cases where POI/POE was paid. Garavito was also entitled under the agreement to a brokerage fee of 0.7% of the funds laundered by Costa Del Oro during the investigation. The commission was to be paid solely out of Costa Del Oro receipts, not out of funds appropriated to the USCS by Congress, and was capped at $10,000 per month.

From August 1993 through January 1994, Garavito entered into a series of money laundering contracts with a Colombian money broker, Fernando Barrera–Saavedra, which called for him to pick up large sums of money from narcotics traffickers in Detroit, Chicago, New York, Houston and Los Angeles. Undercover agents, acting as Garavito's representatives, picked up the currency, deposited it into an account controlled by the government, and then wire transferred it to a bank chosen by Barrera–Saavedra. This activity resulted in numerous seizures of cash, more than $7 million in all.

During the Costa Del Oro investigation Garavito received $50,000 in brokerage fees, reflecting his percentage of the laundered funds, and $130,000 in recognition of the time spent and risk undertaken, the amount of cash seized by the government, and the number of organizations identified and infiltrated. His supervising agent's requests for payments had to be approved by senior USCS officials in Washington. On April 3, 1995, after the investigation was closed, Garavito received an additional $400,000 for his cooperation.

Meanwhile, as a result of Garavito's contracts with Barrera–Saavedra, between September and December 1993 undercover

---

1. We treat only the issue of outrageous government conduct in this opinion, considering Cuellar's remaining points in a memorandum disposition.

2. Section 1619 provides that any non-government employee who furnishes information concerning any violation of the customs laws that leads to a forfeiture of property may be awarded an amount not to exceed 25 percent of the net amount recovered, up to $250,000 per case.

agents picked up some $3.2 million from the Detroit branch of the organization run by "Aldo." Aldo wanted to get Garavito involved in transporting cocaine from Los Angeles; under the direction of Customs agents, Garavito spoke to Aldo's boss, "Negro," about transporting a large quantity of cocaine to New York. Eventually Aldo gave Garavito the pager number of "Carlos," who turned out to be Cuellar, and on January 12, 1994, they arranged for the exchange of 200 kilograms of cocaine. The transaction was surveilled. Cuellar's fingerprints and palm prints were recovered from seven of the boxes that contained the cocaine, and he was later connected with a phone number for "Saulo" listed in the address book of Victor Neris, who owned the van that was used for delivering the 200 kilograms.

Then on April 25, 1994, Cuellar was stopped at Los Angeles International Airport en route to New York. He had checked his suitcase with the skycap, and proceeded to the gate. His suitcase had a combination lock as well as a padlock and its identification tag was not filled out. A sheriff's deputy (with no knowledge of the Garavito investigation) approached Cuellar, walked alongside him, told Cuellar she wanted to ask him some questions, and told him that he was not under arrest and was free to go. The deputy asked Cuellar for identification; he handed her his temporary driver's license, and, when asked his address, could not recall it. The deputy then asked Cuellar for his ticket; he handed her a one-way ticket to New York in the name of Oscar Gomez. She returned the driver's license and ticket and asked for permission to search Cuellar's luggage. Cuellar handed her a key, and one kilogram of cocaine was discovered.

Cuellar was indicted on July 22, 1994. He moved to dismiss the indictment for outrageous government conduct, to sever the count for possession of the kilogram of cocaine that was found in his luggage from the distribution count for the 200 kilograms, and to suppress the evidence discovered in the search of his suitcase. The district court denied each motion, but indicated that its denial of the motion to dismiss for outrageous government conduct was without prejudice, subject to renewal as facts developed at trial.

Cuellar's trial began October 25, 1994. On November 17, 1994, the jury returned guilty verdicts on both counts. He filed this timely appeal.

## II

Cuellar argues that the district court erred in denying his motion to dismiss the indictment for outrageous government conduct because Garavito was paid a "contingent fee" that was dependent upon the amount of drugs involved and upon whether Cuellar was convicted. He points out that the Fifth Circuit held that an informant paid a contingent fee is not a competent witness and that a conviction based on such testimony must be reversed, *Williamson v. United States*, 311 F.2d 441 (5th Cir.1962), even though *Williamson* was overruled in *United States v. Cervantes–Pacheco*, 826 F.2d 310 (5th Cir. 1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988), and that we have stressed the danger to the criminal justice system that exists with the use of paid informants. *See United States v. Bernal–Obeso*, 989 F.2d 331 (9th Cir.1993). Cuellar submits that when the government gives a confidential informant the authority to develop a crime and his monetary reward depends on getting people convicted and on the magnitude of the drug or money laundering transaction, the informant has too great an incentive to fabricate evidence and distort the truth.

The government counters that that isn't what happened in this case. It emphasizes that no indictment has ever been dismissed on the footing that a contingent fee arrangement alone constitutes outrageous government conduct; that to dismiss an indictment on that ground requires government conduct that is "so grossly shocking and so outrageous as to violate the universal sense of justice," *United States v. Allen*, 955 F.2d 630, 631 (9th Cir.1992) (internal quotation omitted); that the Supreme Court has never upheld dismissal of an indictment premised on outrageous government conduct, and that we have done so only once—when the government basically created and ran the entire

illegal operation; and that nothing in this case suggests that Garavito created Cuellar's criminal activity, fabricated evidence, or did anything other than infiltrate an existing organization by providing needed money laundering services.

### A

■ We review the district court's decision not to dismiss the indictment on due process grounds based on the government's outrageous conduct de novo. *United States v. Garza–Juarez,* 992 F.2d 896, 903 (9th Cir. 1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). However, we view the evidence in the light most favorable to the government, and we accept the district court's findings unless clearly erroneous. *United States v. Emmert,* 829 F.2d 805, 810–11 (9th Cir.1987).

### B

■ There is no question that this informant got paid a ton of money. But that isn't the question we have to decide. "The government's conduct may warrant a dismissal of the indictment if that conduct is so excessive, flagrant, scandalous, intolerable and offensive as to violate due process." *Garza–Juarez,* 992 F.2d at 904. We cannot say that it was.

■ We have previously recognized that "few would engage in a dangerous enterprise of this nature without assurance of substantial remuneration." *United States v. Reynoso–Ulloa,* 548 F.2d 1329, 1338 n. 19 (9th Cir.1977) (government's use of contingent fee arrangement whereby informant was paid a specific amount for each pound of heroin seized and for each "body" involved did not amount to entrapment per se), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). Congress has done the same thing, providing for compensation based on a percentage of successful forfeitures. 19 U.S.C. § 1619. Although the total compensation Garavito received was undeniably substantial, it was on account of the entire Costa Del Oro operation—not just that part which involved Cuellar. Costa Del Oro spanned a number of months and many cities, netting millions of dollars and many prosecutions. Nothing in the record suggests that in this context, Garavito's compensation was so excessive as to be outrageous. In any event, by virtue of his contractual waiver of § 1619, Garavito's total compensation was *less* than what would otherwise have been available to him by statute. Compensating Garavito a substantial sum was, therefore, not outrageous government conduct infringing Cuellar's rights to due process.

■ Nor were Cuellar's due process rights violated by the contingency aspects of Garavito's fee arrangement. Cuellar faults both components: that Garavito was paid a percentage of funds laundered through Costa Del Oro, and that his POI/POE payments for participation in the investigation were "predicated on the Source's participation in the investigation and the results of any subsequent criminal or civil proceedings." At bottom, however, both are vulnerable only because they provide an incentive to the informant to entrap, or to lie.

We, and other courts as well, have consistently held that the government is not precluded from using informants before or during trial simply because an informant may have a motive to falsify testimony or to entrap innocent persons. Indeed, the Supreme Court dealt with the issue in *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and resolved it against Cuellar's position here. While the Chief Justice in dissent would have foreclosed prosecution based on what he thought was a particularly unsavory use of an informant, the majority held that regardless of the fact that Hoffa's informant may have had more of a motive to lie than most,

> it does not follow that his testimony was untrue, nor does it follow that his testimony was constitutionally inadmissible. The established safeguards of the Anglo–American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury. At the trial of this case, [the informant] was subjected to rigorous cross-examination, and the extent and nature of his dealings with federal and state authorities

were insistently explored. The trial judge instructed the jury, both specifically and generally, with regard to assessing [the informant's] credibility. The Constitution does not require us to upset the jury's verdict.

*Id.* at 311–12, 87 S.Ct. at 418–19 (footnotes omitted). *See also Reynoso–Ulloa,* 548 F.2d at 1339 (declining to adopt *per se* entrapment rule); *United States v. Cervantes–Pacheco,* 826 F.2d 310 (5th Cir.1987) (declining to adopt *per se* exclusionary rule), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); *United States v. Dailey,* 759 F.2d 192, 199–200 (1st Cir.1985) (same); *United States v. Jones,* 575 F.2d 81, 86 (6th Cir.1978) (same); *United States v. Hodge,* 594 F.2d 1163, 1165 (7th Cir.1979) (same). Likewise in Cuellar's case, all the traditional safeguards were in place. The jury knew that Garavito had been paid $180,000 before trial, and that his supervising agent had requested a bonus to be paid after trial. Cuellar doesn't complain that the jury was inadequately cautioned or instructed. And the extent to which it mattered that Garavito may have had an incentive to prolong and expand the undercover operation because of his fee arrangement could be measured by the jury against the evidence of Cuellar's guilt.

Cuellar was not involved in the money laundering activities on which Garavito received a percentage of the action. He came into the picture only because Aldo wanted Garavito to transport some cocaine from Los Angeles and gave the informant the pager number of a man identified as "Carlos" to call; their contacts were limited, and only over the telephone; and the operation in which both played a part lasted only a few days. Garavito had nothing at all to do with the cocaine that Cuellar was caught transporting at the airport. There was, in short, nothing remotely outrageous about his pretrial relationship with Cuellar. *Cf. Greene v. United States,* 454 F.2d 783 (9th Cir.1971) (government's creating and maintaining the criminal activity and prodding defendants to engage in it barred prosecution on due process grounds); *see also United States v. Dota,* 33 F.3d 1179, 1185 (9th Cir.1994) (even if government's conduct were outrageous, there is no due process violation if it is not outrageous with respect to the particular defendant), *cert. denied,* —— U.S. ——, 115 S.Ct. 1432, 131 L.Ed.2d 313 (1995).

Nor does the fact that the informant's total compensation wasn't settled until after Cuellar's trial offend due process. While the agreement could be interpreted as making Garavito's POI/POE payments depend on whether convictions were obtained, the agent who negotiated the agreement and put in the requests for payments to the informant explained that arrests, indictments, seizures, forfeitures, identification of organizations, and shutting down avenues of import were "results" that merited payment, as well as convictions. Nothing in the record ties Garavito's $400,000 bonus to the result of Cuellar's trial, as distinguished from other results obtained by virtue of Garavito's overall efforts in Costa Del Oro. There is no evidence that Garavito knew how much had been requested, or what he would be likely to receive. *Cf. United States v. McQuin,* 612 F.2d 1193 (9th Cir.) (no outrageous government conduct where FBI guaranteed informant payment only if there was an arrest and informant testified), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980). In any event, there was extensive cross-examination on the point, and we find no constitutional error.

Accordingly, we hold that paying an informant based on a percentage of laundered funds and on results obtained in an extensive undercover operation did not constitute outrageous government conduct in violation of Cuellar's rights to due process.

AFFIRMED.

WIGGINS, Circuit Judge, concurring:

Civil and criminal forfeitures of assets have become one of the most prominent methods of enforcing drug-related and racketeering laws. The range of assets forfeited encompasses not only contraband and articles put to unlawful use, but also proceeds traceable to unlawful activity or intended for unlawful use, which can include homes, bank accounts, boats, planes, and cars. The billions of dollars in forfeitures in turn finance

the law enforcement efforts to investigate and prosecute more wrongdoers. The drastic increase in civil and criminal forfeitures, however, has required consideration of numerous constitutional problems with such a sweeping approach-what to do about innocent owners of property, whether forfeitures are subject to the Excessive Fines Clause, and most recently, whether forfeitures constitute punishment for the purpose of the Double Jeopardy Clause. This case presents us with yet another problem created by the federal government's current approach to enforcing drug-related laws by focusing on the forfeiture of assets or funds somehow connected to the violation of such laws.

I write separately to emphasize the dangers of permitting a government agency to pay an informant, who is known to have engaged in criminal activity, over half a million dollars for little more than a year's work, primarily because the information provided led to over $7 million in forfeitures.

First, I am distressed to find that the USCS is in fact authorized by Congress to pay informants in the amount and the manner employed in this case. Second, although I am forced to conclude under our prior cases that paying an informant $580,000, $400,000 of which is paid after the informant testifies against the defendant, is not "so excessive, flagrant, scandalous, intolerable and offensive as to violate due process," *United States v. Garza–Juarez*, 992 F.2d 896, 904 (9th Cir.1993), *cert. denied*, 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994), I nevertheless am personally offended by the $580,000 payment.

### I.

After being arrested in February 1991 for transporting two kilograms of cocaine in his car, Carlos Garavito began working as an informant for the Ventura police department. Garavito agreed to aid the Ventura police in arresting at least three other persons involved in dealing cocaine, so that the authorities would not pursue charges against him. During the next year-and-a-half, Garavito worked for both state and federal authorities, including on occasion the USCS.

In August 1993, Garavito entered into a Personal Assistance Agreement with the USCS in connection with his assistance in Costa Del Oro, a money laundering operation run by the USCS. Under ¶ 6 of the agreement, Garavito was to be paid " 'purchase of information/purchase of evidence' (POI/POE) payments for the Source's participation in this investigation. Amounts are predicated on the Source's participation in the investigation and the *results of any subsequent criminal or civil proceedings.*" (Emphasis supplied.) In return, Garavito agreed to accept POI/POE payments as full compensation and to forfeit his right to apply for an award under 19 U.S.C. § 1619, or any other applicable statute.

Further, under ¶ 13 of the agreement, Garavito was to be paid 10% of gross commissions (or 0.7% of funds laundered) received by Costa Del Oro from money laundering organizations uncovered by the Source. This commission was not to exceed $10,000 during any calendar month. In addition, the agreement provides:

> Such commission is to be paid solely out of the receipts of Costa Del Oro and not out of any funds appropriated to the USCS by Congress. If it is ultimately determined by an appropriate court that funds laundered by Costa Del Oro must be returned, Source agrees to return the brokerage commission referred to above, and the USCS shall not be liable to the Source for such commission.

(Emphasis supplied.)[1]

At the time of trial, Garavito had been paid a total of $180,000 for his assistance to the USCS. He had been paid $27,000 in exchange for performing basic services as an informant prior to signing the Personal Assistance Agreement.[2] In addition, Garavito

---

1. The agreement also required Garavito to "testify fully and truthfully in any judicial proceedings necessary" if requested by the USCS.

2. Garavito's payment record reflects that USCS paid Garavito a total of $7,000 in 1991 and 1992.

In June and July of 1993, prior to signing the agreement, Garavito received approximately $20,000.

was paid approximately $103,000, in part as POI/POE payments pursuant to ¶ 6 of the agreement, and in part after the close of the investigation.[3] These payments were based on the amount of time spent and risk undertaken by Garavito, the seizures by the government (in excess of $7 million),[4] the number of organizations penetrated, the criminal proceedings that would take place, Garavito's living expenses prior to trial while he was still assisting the government, and monetary assistance to relocate Garavito's family.

According to USCS Agent James Donahue, Garavito was also paid $50,000 in "brokerage fees" pursuant to ¶ 13 of the Personal Assistance Agreement during the course of the money laundering operation. Agent Donahue testified that Costa Del Oro was a "money-making operation," and therefore Garavito's brokerage fee was paid out of the commissions the USCS received for laundering funds for the Cali cartel.[5] Despite this testimony, Donahue also stated that prior to entering into the contract with Garavito, he requested and received approval to pay Garavito $85,000. Garavito's payment record indicates that the brokerage fee payments were deducted from this sum.[6]

Lastly, prior to trial, Donahue requested that Garavito be paid an additional $400,000 based upon the amount of time and risk Garavito had undertaken, his cooperation, the extensive seizures, and the number of organizations penetrated and individuals identified. This request had not been acted upon at the time of trial. Donahue testified that this sum, if approved, would be paid out of the U.S. Treasury Forfeiture Fund. Moreover, although Donahue had informed Garavito that he had made a request for an additional award, Garavito had no knowledge of the exact sum requested or whether he would receive any award at all. Subsequently on April 3, 1995 (*after* Cuellar's conviction), Garavito was paid the additional sum of $400,000.

## II.

To begin, I believe that Congress is ill-advised to have authorized agencies such as the USCS to pay informants, who, like the informant in this case, often have engaged in criminal activity themselves, in the manner and in the amounts provided by the Personal Assistance Agreement in this case.

Congress has created a "Department of the Treasury Forfeiture Fund," 31 U.S.C. § 9703(a), which consists of, *inter alia*, all forfeited currency and all proceeds from forfeitures under any law administered by a Department of Treasury law enforcement organization. 31 U.S.C. § 9703(d).[7] Moreover, Congress has appropriated from the Treasury Fund "such sums as may be necessary to carry out" the law enforcement purposes

---

3. The payment record indicates that Garavito received roughly $13,000 during the course of the investigation. After the money laundering investigation ended, USCS Agent James Donahue testified that USCS continued to pay Garavito "outside the contract" both out of funds previously approved to be paid pursuant to the contract and additional funds requested by Agent Donahue; these payments totaled approximately $90,000.

4. Note that although the government seized over $7 million in assets, this does not appear to be the same $7 million in funds that Costa Del Oro laundered for the Cali cartel. *See infra* n. 5.

5. According to Donahue, Costa Del Oro laundered over $7 million in funds, which were not seized since to do so would necessitate ending the investigation. For example, Costa Del Oro agents would pick up $1 million in Detroit (at the direction of one of Garavito's contacts), launder the funds, keep $70,000 as Costa Del Oro's seven percent commission, and wire transfer $930,000 to the bank to which Garavito had been told to transfer the funds. Garavito then received $7,000–ten percent of the $70,000. The record does not indicate where the USCS deposited the "commissions" received by Costa Del Oro for laundering money.

6. The payment record indicates that $85,000 was approved on July 16, 1993, and that, because a prior payment of $12,000 to Garavito was deducted from that amount, $73,000 remained available. The payment record also reflects that payments to Garavito (including the brokerage fee payments) were deducted from the remainder of this initial sum.

7. Forfeited property is defined as all property and currency forfeited pursuant to (1) a judicial forfeiture if the underlying seizure was made by an officer of a Treasury law enforcement organization and (2) a civil administrative forfeiture conducted by a Treasury law enforcement organization. 31 U.S.C. § 9703(m).

enumerated in 31 U.S.C. § 9703(a)(2). *See* 31 U.S.C. § 9703(g).[8] Accordingly, the USCS, as "a Department of the Treasury law enforcement organization,"[9] may utilize the Treasury Fund (1) to pay awards to informers under 19 U.S.C. § 1619, (2) to pay awards for information or assistance leading to forfeitures, (3) to make payments for purchase of evidence or purchase of information leading to a forfeiture or relating to a money laundering violation, or (4) to reimburse private persons for expenses incurred in assisting the USCS. 31 U.S.C. §§ 9703(a)(1)(C), (a)(2)(A), (B), and (G).

Thus, the sums paid by USCS to Garavito for POI/POE, for Garavito's expenses, and as an award based upon the amount of the seizures, number of organization penetrated, etc., were appropriated by Congress to be used in precisely this manner. The fact that the POI/POE payments were "predicated on the Source's participation in the investigation and the results of any subsequent criminal or civil proceedings" and the fact that the $400,000 award was based on the number of organizations infiltrated, the numerous convictions obtained and over $7 million in seizures, corresponds to the statutory requirement that POI/POE payments or awards be made only where the information leads to a civil or criminal forfeiture, relates to a money laundering violation, or relates to a criminal violation that could lead to a forfeiture. 31 U.S.C. §§ 9703(a)(2)(A), (B).

Moreover, Congress places no monetary limits on payments made pursuant to 31 U.S.C. §§ 9703(a)(2)(A) and (B). The USCS could have paid Garavito a million dollar award or a two million dollar award, and, provided the money was in the Treasury Forfeiture Fund, such an amount would be legally authorized.[10] I believe Congress has greatly erred in giving such latitude to law enforcement agencies. Such large sums of money far exceed what the agents themselves earn (and what most law-abiding persons earn) in any given year. This must cause great temptation as well as frustration among those working in law enforcement positions. In addition, Agent Donahue testified that such payments are made in cash, again unnecessarily inviting corruption on the part of agents and informants.[11] Moreover, informants such as Garavito have already been "paid"—they have not been prosecuted for crimes or have received reduced sentences. I cannot believe that average citizens, who would have difficulty accumulating $580,000 over a lifetime, much less over the course of one year, would find it in the public interest to pay someone such as Garavito such a large sum, no matter how many forfeitures resulted from the information he provided.

Further, one provision of Garavito's Personal Assistance Agreement causes me grave concern. Under ¶ 13 of the agreement, Garavito was paid a brokerage commission totaling $50,000, which was calculated as a percentage of the funds obtained through the money laundering investigation. The commission was not to exceed $10,000 in a calen-

---

**8.** Congress has also authorized the retention of forfeited property for official use, the transfer of such property to any federal agency, and the transfer of such property to a state or local law enforcement agency that participated in the seizure. 31 U.S.C. § 9703(h).

**9.** *See* 31 U.S.C. § 9703(p)(1).

**10.** Note that, in the agreement, Garavito waived his right to apply for an award pursuant to 19 U.S.C. § 1619, which authorizes payments of awards to informers who provide information to the USCS that results in a forfeiture, and limits those awards to $250,000. Under 19 U.S.C. § 1619, if a non-government employee (1) seizes property subject to forfeiture under the customs laws or furnishes original information to a customs officer concerning any fraud upon the customs revenue or any violation of the customs laws, and (2) if such seizure or such information

leads to recovery of any duties, fines, penalties or forfeitures of property, the Secretary of Treasury may award the person an amount not to exceed 25 percent of the net amount recovered. 19 U.S.C. § 1619(a). The amount paid to any person under § 1619 "may not exceed $250,000 for any case." 19 U.S.C. § 1619(c); 19 C.F.R. § 161.16. Further, any amount paid under § 1619 is to be paid out of appropriations available for the collection of the customs revenue. 19 U.S.C. § 1619(d). *See also* 31 U.S.C. § 9703(a)(1)(C) (authorizing payment of § 1619 awards out of Treasury Forfeiture Fund).

**11.** For example, Agent Donahue testified that the USCS does not file a W–2 nor does it check to ensure that the informants pay taxes on the payments.

dar month; moreover, the commission was "to be paid solely out of the receipts of Costa Del Oro and not out of any funds appropriated to the USCS by Congress." I can find no statutory authorization for such an arrangement.

It is axiomatic that only Congress can appropriate funds from the Treasury. U.S. Const. art. I, § 9, cl. 7; *Republic Nat'l Bank of Miami v. United States,* 506 U.S. 80, 93, 113 S.Ct. 554, 562, 121 L.Ed.2d 474 (1992). Here Agent Donahue testified that Garavito was paid not out of seized or forfeited funds, but rather out of the "commission" the USCS received as a money launderer.[12] Donahue testified that USCS did not seize and forfeit the funds it was laundering. Instead, Costa Del Oro received a commission, from which it paid Garavito a commission. The legal status of such funds is difficult to ascertain. It appears that under 19 U.S.C. § 527, funds received by the USCS for operating a money laundering operation would be "fees received for services" or "miscellaneous receipts," both of which must be paid into the Treasury. 19 U.S.C. § 527.[13] As with any funds deposited into the Treasury, the USCS cannot spend the funds absent an appropriation.[14]

Accordingly, if the USCS was in fact neglecting to deposit the receipts from Costa del Oro into the Treasury, and was paying Garavito out of unappropriated funds, it was not authorized to do so. I can see no legitimate reason for the USCS to agree to pay an informant out of unappropriated funds when the Treasury Forfeiture Fund was created for the express purpose of paying informants under these circumstances. Such arrangements reflect a perception by the USCS that funds "earned" by the USCS through its participation in criminal enterprises (such as the money laundering of drug proceeds) are somehow outside of Congress' purview.

I recognize that, despite the contractual language used by the USCS in its Personal Assistance Agreement and despite Agent Donahue's testimony, it appears that the brokerage fee was in fact deducted from funds approved at the beginning of Costa Del Oro, funds that presumably were paid from the Treasury Forfeiture Fund, as authorized by 31 U.S.C. § 9703(a)(2)(A), (B). Nevertheless, the USCS' attempt to draft a contract that expressly avoids paying an informant from appropriated funds greatly disturbs me.

In sum, I am distressed to find that the USCS is authorized by Congress to pay informants such as Garavito a sum totaling

12. It appears that the USCS structured the brokerage fee to avoid paying Garavito the brokerage fee out of the Treasury Fund, and to have a court subsequently determine that the money laundering proceeds must be returned. *See* Personal Assistance Agreement, ¶ 13 ("If it is ultimately determined by an appropriate court that funds laundered by Costa Del Oro must be returned, Source agrees to return the brokerage commission referred to above, and the USCS shall not be liable to the Source for such commission.").

13. 19 U.S.C. § 527 states:

   [A]ll sums received from fines, penalties, and forfeitures, connected with the customs, and from fees paid into the Treasury by customs officers, and from storage, cartage, drayage, labor, and services, shall be covered into the Treasury as are other miscellaneous receipts. I could find no case law or regulations interpreting or discussing this statute. Moreover, I found no authority discussing how an agency should categorize funds received as a payment for an undercover law enforcement operation such as Costa Del Oro.

14. Similarly, when the USCS seizes property such as money laundering proceeds, the property

becomes property of the United States only once it is judicially or administratively forfeited. *See* 19 U.S.C. § 1609(b) (administrative declaration of forfeiture has same effect as judicial decree and vests title in the United States as of the date of forfeiture); *United States v. Sanchez–Cobarruvias,* 65 F.3d 781, 783–84 (9th Cir.1995) (administrative declaration of forfeiture is means by which the government legally obtains title to seized property), *cert. denied,* —— U.S. ——, 116 S.Ct. 797, 133 L.Ed.2d 745 (1996). *See also United States v. A Parcel of Land, Bldgs., Appurtenances and Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.,* 507 U.S. 111, 125–27, 135–36, 113 S.Ct. 1126, 1135–37, 1140–41, 122 L.Ed.2d 469 (1993) (under 21 U.S.C. § 881(h) title does not vest in government until judicial decree of forfeiture is obtained) (Stevens, J., plurality; Scalia, J., concurring). Once forfeited, whether administratively or judicially, the property is to be deposited in the Treasury Forfeiture Fund. 19 U.S.C. § 1609(a); 31 U.S.C. § 9703(d). The Treasury Fund is then appropriated by statute for the specified law enforcement purposes such as paying for information from informants.

$580,000 for information that leads to forfeitures and/or criminal prosecutions. Other than the $250,000 limit for awards to informants under 19 U.S.C § 1619, there are no monetary limits placed by Congress upon such payments. I am also concerned that the USCS drafted the Personal Assistance Agreement in order to pay an informant out of unappropriated funds.

## III.

I turn now to Cuellar's claim of outrageous government conduct. Until today, we had yet to decide whether (1) the contingent payment of an informant based upon the amount of money laundered and upon the "subsequent results in civil or criminal proceedings", (2) the payment of $400,000 to an informant *after* he testifies against the defendant, and (3) the payment to an informant of a sum as large as $580,000, together constitutes conduct that is "so excessive, flagrant, scandalous, intolerable and offensive as to violate due process." *Garza–Juarez*, 992 F.2d at 904. Were I deciding this case upon a clean slate, I would hold that such conduct is so offensive as to violate due process.

The government correctly notes that we have rarely found government conduct to be so shocking or outrageous as to violate universal notions of justice.[15] I also recognize that no circuit has held that the contingent payment of an informant is alone sufficient to constitute outrageous government conduct.[16] In addition, several circuits have rejected challenges to admissibility of testimony of informants who are paid on a contingent fee basis.[17]

---

**15.** *See, e.g., Garza–Juarez*, 992 F.2d at 904 (targeting individual for investigation without any reason to suspect he was engaging in illegal conduct was not outrageous); *United States v. Barrera–Moreno*, 951 F.2d 1089 (9th Cir.1991), *cert. denied*, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992) (informant's use of cocaine on several occasions with defendant not outrageous government conduct even if government had directed the conduct); *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991) (informant's encouragement of 18–year–old drug treatment center patient to deal drugs was not constructive enforcement method but was not outrageous government conduct); *United States v. Emmert*, 829 F.2d 805 (9th Cir.1987) (confidential informant's offer of $200,000 finder's fee to college student in return for supplying cocaine not outrageous government conduct); *United States v. Simpson*, 813 F.2d 1462 (9th Cir.) (no due process violation where government used known prostitute as informant, even after becoming aware she was engaging in sexual activity with the suspect and was involved in unrelated criminal activity), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987).

As noted by the majority, we have only once reversed convictions based upon outrageous government conduct that constituted a deprivation of due process. *See Greene v. United States*, 454 F.2d 783 (9th Cir.1971) (convictions reversed where government established illegal bootlegging operation, provided substantial equipment and supplies, ran it for two-and-a-half years, and was its sole customer).

**16.** *See United States v. Valona*, 834 F.2d 1334, 1343–44 (7th Cir.1987) (recruitment of an informant specifically to work on the defendant's case and the agreement to pay the informant ten percent of whatever was recovered did not constitute outrageous government conduct); *United*

*States v. Rey*, 811 F.2d 1453, 1456–57 (11th Cir.) (government's conduct was not so outrageous as to violate due process where it targeted the defendant and obtained the cooperation of two informants in exchange for lenient treatment with respect to charges pending, where the government agent made the buy, thus avoiding the potential problem of manufactured evidence by a contingently motivated informer and the government did not call the informants as witnesses, thus avoiding the potential incentive to perjure testimony), *cert. denied*, 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987); *United States v. Spector*, 793 F.2d 932, 934–36 (8th Cir.1986) (fee agreement between the government and an informant did not violate the defendant's right to due process, where the agreement provided that "this Office will review in good faith the extent and value of Mr. Adams' information and cooperation as it relates to successfully solving and prosecuting crimes," because the informant's testimony had "very little to do with the conviction" of the defendant), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

**17.** *See, e.g., United States v. Cresta*, 825 F.2d 538 (1st Cir.1987), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) (informant's testimony was not so unreliable that it must be excluded where informant received a total of $53,000 from the D.E.A. prior to trial, was expecting to receive an additional $50,000 as a result of a forfeiture and where the informant's payment was not contingent upon the conviction of the defendants); *United States v. Cervantes–Pacheco*, 826 F.2d 310 (5th Cir.1987) (en banc) (informant who is promised a contingent fee by the government is not disqualified from testifying at trial; the credibility of the witness is properly for the jury to determine), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

I do not disagree with the reasoning in the above cases. Here, however, we are presented with an informant who is contingently motivated, does testify against the defendant, and is paid a sum of money that far exceeds amounts discussed in any case. Prior to trial, Garavito was paid a total sum of $180,000 for his services as an informant, and this sum was predicated in part on the results of any subsequent criminal or civil proceedings. At the time of trial, Agent Donahue had requested that Garavito be awarded an additional sum of $400,000, which Garavito received a month after Cuellar's conviction. I believe the sheer enormity of such a sum, coupled with the timing of the payment, would distinguish this case from the long line of cases rejecting outrageous government conduct claims.

However, in order to warrant dismissal of the indictment, the government's conduct must not only be outrageous and offensive, it must also be linked to the defendant seeking dismissal. *See United States v. Dota,* 33 F.3d 1179, 1185 (9th Cir.1994) (even if government's conduct was outrageous, it was not outrageous with respect to the defendant), *cert. denied,* —— U.S. ——, 115 S.Ct. 1432, 131 L.Ed.2d 313 (1995). Here, Garavito's testimony was not instrumental in linking "Carlos" to Cuellar.[18] Thus, any incentive for Garavito to perjure himself (in order to obtain the additional $400,000) was unlikely to have any effect on the trial. Cuellar or "Carlos" was not a target picked by Garavito; nor does it appear that Garavito was an informant who was given the discretion to "develop the crime." *Cf. United States v. McClelland,* 72 F.3d 717 (9th Cir.1995) (government informant did not manufacture crime where he encouraged defendant in plan to murder defendant's wife), *cert. denied,* —— U.S. ——, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996).

Because none of these factors is present here, I cannot hold that the government's conduct with respect to Cuellar was so outrageous as to violate Cuellar's due process rights and warrant dismissal of his indict-ment. Where I do part with the majority, however, is in its apparent acceptance of paying an informant over half a million dollars, $400,000 of which is paid to the informant *after* testifying. Regardless of whether the jury has an opportunity for considering the informant's motive to lie when considering the evidence against the defendant, I do not believe our government agencies should be giving an informant—or anyone who testifies—that great an incentive.

Nevertheless, this is a situation that I believe Congress, and not this court, must rectify. If the record demonstrated that Garavito was given leeway to develop the crime or that his testimony supplied the only link between Cuellar and the crime he was convicted of, I believe we would be compelled to dismiss Cuellar's indictment. Payment to an informant of over half a million dollars, $400,000 of which was paid *after* the informant testified, in conjunction with a contractual agreement that predicates payment in part upon the results of criminal proceedings, would constitute outrageous government conduct in such a case. I find the government's conduct no less outrageous here, it is simply not outrageous with respect to this defendant.

## IV.

For the foregoing reasons, I concur in the judgment.

---

**18.** To the contrary, the evidence against Cuellar consisted primarily of Victor Neris' testimony (that he loaned his van to Cuellar and that "Saulo's" pager number belonged to Cuellar), the fact that the pager number was billed to the address used by Cuellar on his driver's license and the fact that Cuellar's fingerprints were found on the boxes containing the packages of cocaine.