122 F.3d 1161
 97 Cal. Daily Op. Serv. 7144, 97 Daily Journal
D.A.R. 11,501
UNITED STATES of America, Plaintiff-Appellant,
v.
Benjamin Amoral MARTINEZ, Defendant-Appellee.
 No. 96-30178.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 6, 1997.
Order and Opinion Decided Sept. 4, 1997.
 
 Kristine Olson, United States Attorney, John C. Laing, Special Assistant United States Attorney, Portland, OR, for Plaintiff-Appellant.
 Alan C. Gallagher, Canby, OR, for Defendant-Appellee.
 Appeal from the United States District Court for the District of Oregon; Owen M. Panner, District Judge, Presiding. D.C. No. CR 95-266 PA.
 Before: FLETCHER and TASHIMA, Circuit Judges, and SCHWARZER,* Senior District Judge.
 Opinion by Judge TASHIMA; Dissent by Judge SCHWARZER.
 ORDER
 TASHIMA, Circuit Judge:
 
 
 1
 The Memorandum disposition filed July 24, 1997, 1997 WL 418890, is hereby withdrawn and the opinions attached hereto are ordered filed in its place.
 
 OPINION
 
 2
 Benjamin Martinez was convicted by jury of distribution of methamphetamine and possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The district court then granted his motion for a judgment of acquittal and, in the alternative, for a new trial, finding that the government had failed to carry its burden with respect to Martinez's entrapment defense. United States v. Martinez, 924 F.Supp. 1025 (D.Or.1996). The government appeals. We have jurisdiction under 18 U.S.C. § 3731, and we affirm.
 
 I.
 
 3
 In early 1995, Martinez moved to Gervais, Oregon, and was introduced to Alvaro Plancarte by a mutual friend. Unknown to Martinez, Plancarte was a paid police informant. Within three months, Martinez would sell or attempt to sell more than 12 pounds of methamphetamine to Plancarte.
 
 
 4
 Because the central issue in this case is whether Plancarte entrapped Martinez, the key facts revolve around the relationship between these two men. Plancarte was introduced to Martinez as a mechanic and agreed to do some work on Martinez's car. He made several visits to Martinez's house and, about three weeks after they had met, Plancarte told Martinez that he bought and sold drugs on a large scale. The parties dispute Martinez's response. Plancarte claims that Martinez volunteered that he knew someone who made methamphetamine and that Martinez met with him to ask how much methamphetamine Plancarte would want if they went ahead with the deal. Martinez claims that Plancarte repeatedly asked him to help sell drugs, that he refused, that Plancarte nonetheless persisted over the weeks that followed, that Plancarte cajoled, scolded and pressured him, and that Plancarte began to tell Martinez the basics of drug commerce. Eventually, according to Martinez, Plancarte offered to get Martinez $20,000 if Martinez helped him and promised to be his "Padrino."[1]
 
 
 5
 Sometime in May, 1995, Plancarte told Officer Timothy Diede that he had a possible drug seller. Diede was then working on another case and did not immediately act upon this information; nor did he make any note of it. However, in late May, he authorized Plancarte to arrange a controlled buy from Martinez. Martinez sold him a half pound of methamphetamine. Afterwards, police surveillance observed Martinez drive in an unusual manner, which Diede concluded was "counter-surveillance" driving. Martinez contends it was no more than an attempt to find a supermarket that had apparently closed down.
 
 
 6
 Diede then arranged for the Oregon State Police to stop Martinez for a traffic violation to get his full name, which they did. Diede ran a background check on Martinez which turned up no criminal history. In two subsequent controlled buys, Plancarte purchased six pounds of Methamphetamine from Martinez. A final controlled buy was arranged and Martinez was arrested in possession of six pounds of methamphetamine.
 
 
 7
 At trial, Martinez admitted that he had possessed and sold methamphetamine, but asserted that he had been entrapped. The evidence established that he had never been involved in any criminal or drug-related activity. He was generally a follower, rather than a leader.
 
 
 8
 Plancarte had attempted to draw others into drug deals on a number of occasions. Plancarte received $500 per week to uncover drug dealers, plus $3,000 to $4,000 per arrest. Plancarte did not pay income tax on any of this money.
 
 II.
 
 9
 We first address Martinez's threshold contention that the government's appeal is barred by the Double Jeopardy Clause of the Constitution.[2]
 
 
 10
 Our precedent clearly establishes that the government may appeal from the granting of a motion for judgment of acquittal under Fed.R.Crim.P. 29(c) after a jury verdict of guilty because, should the government prevail on appeal, the verdict would be reinstated with no need for a further trial. United States v. Foumai, 910 F.2d 617, 619 (9th Cir.1990) ("If the defendant is initially convicted, however, the government may appeal any subsequent reversal ... because a successful appeal would not necessitate a new trial but would only reinstate the original conviction.") (citing United States v. Wilson, 420 U.S. 332, 352, 95 S.Ct. 1013, 1026, 43 L.Ed.2d 232 (1975); United States v. Sharif, 817 F.2d 1375, 1376 (9th Cir.1987)).
 
 
 11
 None of the cases cited by Martinez is on point. All of them involve an attempted government appeal after a trial court acquittal on the basis of insufficient evidence. See, e.g., United States v. Baptiste, 832 F.2d 1173, 1174 (9th Cir.1987). None holds that the double jeopardy bar applies even though reversal on appeal would not require a new trial. Thus, we turn to the merits of the government's appeal.
 
 III.
 A.
 
 12
 We review de novo the district court's grant of a Fed.R.Crim.P. 29(c) acquittal motion. United States v. Davis, 36 F.3d 1424, 1430 (9th Cir.1994). The jury's finding should not be disturbed unless, "viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that the defendants were predisposed to commit the charged offenses." Id. We conclude that the district court acted correctly. There was no evidence from which a reasonable jury could find that the government carried its burden of proving predisposition beyond a reasonable doubt.
 
 B.
 
 13
 Predisposition is established only after analyzing five factors: (1) the character and reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. United States v. McClelland, 72 F.3d 717, 722 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996). Although none of these factors is controlling, the defendant's reluctance to engage in the criminal activity is the most important. Id.
 
 
 14
 The government concedes that the first two factors weigh in Martinez's favor. The third factor weighs slightly in the government's favor because Martinez would stand to profit from successful drug deals and there was evidence that Martinez needed money at the time.
 
 
 15
 The fourth and most important factor--defendant's reluctance to be drawn into criminal conduct--also favors Martinez. There was undisputed evidence that, despite several attempts by Plancarte to "recruit" him, Martinez did not agree to any actual transaction until more than two months after first being approached by Plancarte. See United States v. Skarie, 971 F.2d 317, 321 (9th Cir.1992) (two month delay cuts against government). There was also undisputed evidence regarding Plancarte's recruitment efforts. This evidence shows that Plancarte was "the one who would initiate [drug discussions] all the time," and that Plancarte asked Martinez repeatedly to help him in drug transactions. Martinez also testified that Plancarte "used to scold me because he said I didn't know how drugs were sold," and that he finally gave in when Plancarte promised to be his "padrino."[3]
 
 
 16
 The government did not offer evidence that contradicted this evidence of Martinez's reluctance. Instead, the government points to evidence which, even when viewed in the light most favorable to the government, is both too ambiguous and too weak to constitute sufficient evidence from which a reasonable jury could find predisposition beyond a reasonable doubt. First, the government points to Plancarte's testimony that Martinez responded to his initial approach by saying he had a brother-in-law who made "crank." This evidence is simply insufficient to support the inference that Martinez was willing to participate in criminal conduct himself--especially given his subsequent resistance to Plancarte's recruitment and the evidence suggesting that no such brother-in-law ever materialized. Indeed, Martinez was only able to find drugs by asking co-workers whether they knew anyone who could supply drugs.
 
 
 17
 Second, the government relies on Plancarte's testimony that, a few weeks after they met, Martinez asked him how many pounds of methamphetamine Plancarte would want if they went ahead with a drug deal. However, at most, this statement merely shows that, some time after first being approached by Plancarte and despite Plancarte's previous persuasive efforts, Martinez's reluctance had not yet been overcome--he still had not decided to participate in a drug transaction, but was only considering it. The fact is that, despite several attempts by Plancarte to "recruit" Martinez, Martinez did not agree to an actual transaction until May, two months after first being approached by Plancarte. Moreover, although Plancarte testified that he reported this incident to Detective Diede immediately, Diede testified that he could recall no such report, and that he did not remember Plancarte reporting on Martinez to him until May. Indeed, neither Plancarte nor Diede could produce a written record of any discussion of Martinez before May. This evidence is simply too weak to support a reasonable inference of willingness.
 
 
 18
 In short, Martinez offered undisputed evidence showing that the most important factor in the five-factor analysis weighs in his favor. The government's evidence on this factor did not conflict with Martinez's evidence, was undermined by its own weaknesses and inconsistencies, and was simply not sufficient to allow a rational jury to conclude, over Martinez's strong evidence to the contrary, that Martinez did not show reluctance to Plancarte's proposals.
 
 
 19
 Finally, the fifth factor--the nature of the inducement--weighs in Martinez's favor. Plancarte spent more than two months wooing Martinez. According to Martinez's uncontradicted testimony, Plancarte cajoled, scolded, and pressured Martinez throughout this time. Among other tactics, Plancarte reassured Martinez not to worry about the police, attempted to teach Martinez about the drug trade, scolded Martinez because he didn't know how to sell drugs, and was "always instructing" him about the drug trade. Eventually, Plancarte attempted to sway Martinez with promises of wealth and friendship. Martinez finally gave in shortly after Plancarte promised to become his "padrino." Thus, the undisputed evidence shows that Plancarte went to great lengths to lure Martinez with pressure tactics, suggestions and promises of companionship, wealth, friendship, and an important symbolic relationship.
 
 
 20
 In addition, there was strong circumstantial support for the inference that Plancarte was inappropriately aggressive in inducing Martinez. For example, Diede admitted on cross-examination that he could not recall ever using the term "entrapment" in discussing with Plancarte the permissible limits of his activity. Plancarte himself testified that "I haven't heard the word, or if I've heard the word, I haven't paid attention to it." Thus, the undisputed evidence shows that Plancarte did not know that, as a government agent, he was legally prohibited from unduly pressuring contacts into drug deals.
 
 
 21
 Further, Plancarte received a weekly salary of $500 for his work as an informant, which constituted his sole source of income. Plancarte also testified that he receives a "bonus" of $3,500 to $4,000 when a contact is arrested. These financial incentives establish that Plancarte had a strong incentive to overcome a reluctant contact's resistance.[4] In short, Plancarte had every reason to be improperly aggressive, thus springing a trap for the unwary innocent.
 
 
 22
 We conclude that four of the five predisposition factors weigh in favor of Martinez, including the most important of them. Further, the third weighs only slightly against him. Accordingly, we agree with the district court that there was not sufficient evidence from which a reasonable jury could find predisposition beyond a reasonable doubt. See e.g., Skarie, 971 F.2d at 320-22 (reversing conviction where same four factors favored defendant and same single factor favored government).
 
 C.
 
 23
 Nonetheless, we address two arguments advanced by the government that do not fall neatly into one of the five categories described above. Neither of those arguments, however, alters the outcome under the five-factor analysis. First, the government argues that Martinez was predisposed because the evidence supports an inference that he was involved with drugs even before meeting Plancarte. The government points to Diede's statement that after the first drug transaction was completed, Martinez engaged in an evasive series of maneuvers which, in Diede's opinion, were typical of an experienced drug dealer's precautionary measures to "shake" any potential followers. However, Diede provided no basis for his opinion; his statements are conclusory and he does not describe, beyond a general reference to U-turns and "strange driving," exactly what led him to believe Martinez was engaged in "counter-surveillance" techniques. Further, there was no evidence that Martinez engaged in this sort of conduct after the other two completed drug transactions. Finally, Martinez provided a plausible explanation for his driving: he was looking, unsuccessfully, for a grocery store which, it turned out, had closed some time before.
 
 
 24
 Second, the government argues Martinez must have been predisposed because he was able to locate a source for the drugs requested by Plancarte. But the evidence on the record is simply inconsistent with the government's theory. Plancarte testified that Martinez said he had a brother-in-law who manufactured methamphetamine, in which case Martinez's knowledge of his relative's activities would not imply that Martinez himself was predisposed. At trial a different scenario emerged, in which Martinez, having decided to provide Plancarte with drugs, "asked around" at his job for someone who had access to drugs. Again, this evidence simply could not support any inference of predisposition prior to Plancarte's recruitment tactics. Davis, 36 F.3d at 1431 (evidence must show preexisting predisposition).
 
 
 25
 Finally, the government complains that the district court improperly relied upon its own assessment of Plancarte's credibility. It is true that the district court may not engage in credibility assessments when considering a motion for acquittal. McClelland, 72 F.3d at 724. However, as the foregoing discussion of the evidence illustrates, the judgment of acquittal granted in this case is justified, even if Plancarte's testimony is taken to be credible.
 
 
 26
 We conclude that a rational jury could not conclude beyond a reasonable doubt that Martinez possessed the requisite predisposition prior to being approached by Plancarte. See Jacobson v. United States, 503 U.S. 540, 553, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992). Here, Plancarte " 'play[ed] on the weaknesses of an innocent party and beguile[d] him into committing crimes which he otherwise would not have attempted.' " Id. (quoting Sherman v. United States, 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958)). Plancarte's efforts led to the "apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." Id. at 553-54, 112 S.Ct. at 1542-43.
 
 
 27
 The district court's grant of defendant's motion for judgment of acquittal is AFFIRMED.
 
 SCHWARZER, Senior District Judge, Dissenting:
 
 28
 I respectfully dissent.
 
 
 29
 The majority holds, as a matter of law, that the jury was unreasonable in finding that Martinez was predisposed to enter into a drug transaction.
 
 
 30
 According to the testimony of Plancarte, the government's agent, he met Martinez while doing some work on Martinez's car. Martinez asked him whether he worked only as a mechanic, to which Plancarte responded that he also bought and sold drugs in large quantities. Martinez immediately volunteered that he had a person "who makes the crank." Plancarte then asked whether he would introduce him and Martinez said he wasn't sure at that moment. About two weeks later, Martinez called Plancarte for help with his car. Plancarte examined the car. Martinez then told him that he had spoken with his brother-in-law, who had asked how many pounds Plancarte would want. The latter responded, 50 pounds to begin with.
 
 
 31
 Over the next three-and-a-half months, Plancarte and Martinez had a number of contacts. Plancarte explains that they were negotiating the first drug sale; the majority apparently believes Martinez when he says that Plancarte was pressuring him into dealing drugs. Within a month of the first sale of a half-pound of methamphetamine, Martinez sold Plancarte one pound and then five pounds.
 
 
 32
 Martinez told a different story, as the court's opinion relates. Even if one were skeptical of Plancarte's version, the court is surely not at liberty to reject it out of hand, particularly when the jury could reasonably take into account that Martinez, having been caught selling large quantities of drugs, had a powerful incentive to shade the truth.
 
 
 33
 It is well settled that to establish entrapment as a matter of law, "there must be undisputed evidence that a government agent induced an otherwise innocent person to commit the alleged crime by trickery, persuasion, or fraud." United States v. Citro, 842 F.2d 1149, 1151-52 (9th Cir.1988). Where "it is not patently clear on the record that [the defendant] was not predisposed to commit the crime, the issue was one for the jury to decide after weighing the testimony and credibility of the witnesses." United States v. Smith, 802 F.2d 1119, 1125 (9th Cir.1986).
 
 
 34
 This is not a case of government inducement of a person patently unwilling to deal drugs. The government did nothing more than have "an agent ... offer the opportunity to buy or sell drugs." Jacobson v. United States, 503 U.S. 540, 549, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). To the extent there was government inducement, it did not occur until after Martinez had made known his interest in his initial contacts with Plancarte, an interest untainted by coercion. Compare United States v. McClelland, 72 F.3d 717, 723 (9th Cir.1995) (noting absence of threats or cash incentives), cert. denied, --- U.S. ----, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996), with Skarie, 971 F.2d at 321 (relying on threats of physical harm and acts of violence). Of the offer to become Martinez's "padrino," which the opinion describes as "an important symbolic relationship," Martinez said it did not mean much to him. A reasonable jury could find that such an offer did not "creat[e] a substantial risk that an otherwise law-abiding citizen would commit an offense." United States v. Davis, 36 F.3d 1424, 1430 (9th Cir.1994).
 
 
 35
 Citro, not cited by the court, is closely analogous. The Citro court held that a rational trier of fact could find predisposition even where a government agent had first suggested a counterfeit credit card scheme and had supplied the counterfiet cards, and where the defendant had agreed to the scheme only after attending two expensive dinners paid for by the agent. The court found it significant that the defendant volunteered the names of merchants he thought might cooperate, much like Martinez volunteered that he knew someone who made methamphetamine. Here, it was Martinez who first proposed supplying drugs without being offered any inducement and who showed, by his subsequent conduct, that he was ready, willing, and competent to deal drugs.
 
 
 36
 The court's references to Plancarte's compensation and his inappropriate conduct are beside the point. "If a government agent persuades an unwilling person to commit a crime and thereby traps an unwary innocent instead of an unwary criminal, there is entrapment as a matter of law.... As the court has made clear, however, it is not the degree of government participation that is critical but, rather, the predisposition of the defendant." United States v. Hermosillo-Nanez, 545 F.2d 1230, 1232 (9th Cir.1976); see also United States v. Reynoso-Ulloa, 548 F.2d 1329, 1338 (9th Cir.1977) (rejecting the argument that the agent was working on a contingent fee basis and reiterating that "predisposition of the defendant, rather than the conduct of the Government, is to be the focal point of an entrapment defense.").
 
 
 37
 I would reverse the judgement of acquittal and remand for a new trial.
 
 
 
 *
 Honorable William W Schwarzer, Senior United States District Judge, sitting by designation
 
 
 [1]
 "Padrino" means a godfather or "second father."
 
 
 [2]
 Our cases say that we "review" this issue de novo. United States v. Affinito, 873 F.2d 1261, 1263 (9th Cir.1989) ("Whether the Double Jeopardy Clause bars appeal and retrial is reviewed de novo.") (quoting United States v. Govro, 833 F.2d 135, 136 (9th Cir.1987)). However, this is not an issue we review, since it was not raised and decided in the district court, but one that we decide in the first instance
 
 
 [3]
 At one point, Martinez also said that Plancarte's offer to be his padrino meant "not much" to him. Nevertheless, it was this offer that immediately preceded his capitulation
 
 
 [4]
 The government's reliance on United States v. Cuellar, 96 F.3d 1179 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1117, 137 L.Ed.2d 318 (1997), to rebut this argument is misplaced. Cuellar's holding, that a $580,000 contingency award to an informant did not, by itself, constitute outrageous government conduct, does not preclude the evidentiary use of such an award. In fact, Cuellar acknowledged the general relevance of an informant's fee arrangement. Id. at 1183. In this case, Plancarte's compensation is relevant to the question of whether he had an incentive to overbear Martinez's will